**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SAS INSTITUTE INC., | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | Case No. 2:18-cv-295-JRG |
| | § | |
| WORLD PROGRAMMING LTD., et al. | § | |
| | § | |
| *Defendants* | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

Before the Court is the Opening Claim Construction Brief (Dkt. No. 189) filed by Plaintiff

SAS Institute Inc. ("Plaintiff," "SAS," or "SII"). Also before the Court are the Responsive Claim

Construction Brief (Dkt. No. 193) filed by Defendants World Programming Limited, Luminex

Software, Inc., Yum! Brands, Inc., Pizza Hut, Inc., and Shaw Industries Group, Inc.

("Defendants") as well as Plaintiff's reply (Dkt. No. 194).

The Court held a hearing on January 29, 2020.

<u>Table of Contents</u>

**I. BACKGROUND**............................................................................................................ **3**

**II. LEGAL PRINCIPLES** ................................................................................................ **3**

**III. AGREED TERMS**.................................................................................................... **7**

**IV. DISPUTED TERMS IN U.S. PATENT NO. 7,170,519** ......................................... **7**

    A. "graph style data item," "graph style data structure," and "graph style metadata" ............... 8

    B. "non-textual format" and "non-textual formatted output" ..................................................... 16

    C. "wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a response role, said category role and said response role being used by in different output non-textual formats".................................. 20

    D. "the graph generator module" ................................................................................................ 25

**V. DISPUTED TERMS IN U.S. PATENT NO. 7,447,686** ....................................... **32**

    E. "a superset of the SQL standard" .......................................................................................... 32

    F. "wherein the first component software object is associated with a first method to textualize," "wherein a first software driver textualizes through a second method," and "wherein a second software driver textualizes through a third method" ............................ 33

**VI. DISPUTED TERMS IN U.S. PATENT NO. 8,498,996**........................................ **36**

    G. "native" and "non-native".................................................................................................... 36

**VII. DISPUTED TERMS IN U.S. PATENT NO. 6,920,458** .................................... **37**

    H. "data model" ......................................................................................................................... 38

    I. "index structure"................................................................................................................... 38

    J. "model repository facility"..................................................................................................... 43

**VIII. CONCLUSION**.................................................................................................... **47**

# I. BACKGROUND

Plaintiff alleges infringement of United States Patents No. 7,170,519 ("the '519 Patent"), 7,447,686 ("the '686 Patent"), 8,498,996 ("the '996 Patent"), and 6,920,458 ("the '458 Patent") (collectively, "the patents-in-suit"). (Dkt. No. 189, Exs. 1–4). The Court addresses each of the patents-in-suit separately herein.

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

# II. LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (citation omitted). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

"In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. at 390).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000) (citations omitted).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citation omitted).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally

given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313 (citations omitted). This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.* (citations omitted).

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *See id.* at 1314–17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* (citations omitted). Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Dig. Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *See Phillips*, 415 F.3d at 1319–24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court

did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *See id.* at 1323–25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus*, 572 U.S. 898. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (citation omitted).

## III. AGREED TERMS

In their November 13, 2019 Joint Claim Construction and Prehearing Statement Pursuant to P.R. 4-3, the parties submitted that "[t]he Parties do not have any agreed claim constructions." (Dkt. No. 184, at 2.)

## IV. DISPUTED TERMS IN U.S. PATENT NO. 7,170,519

The '519 Patent, titled "Computer-Implemented System and Method for Generating Data Graphical Displays," issued on January 30, 2007, and bears an earliest priority date of March 29, 2002. *See* Dkt. No. 189-1 at 2. The Abstract of the '519 Patent states:

> A computer-implemented system and method for generating data graphical displays. The data is indicative of a plurality of variables. The system and method receive data that is to be displayed in a non-textual format. Graph style data items

are retrieved that contain display characteristics for displaying the data in the non-textual format. The data is displayed in accordance with the graph style data items.

## A. "graph style data item," "graph style data structure," and "graph style metadata"

| **"graph style data item"**<br>('519 Patent, Claims 1, 5, 12, 14–18, 20–22, 25, 40–45, 48, 56) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning<br><br>Alternatively:<br>    "Graph styles" define the display characteristics of data. | "a data item which exists substantially independent of the application generating the data and the application generating the graphical output"<br><br>Alternatively:<br>    "a data item that defines the display characteristics of data and exists substantially independent of the application generating the data and the application generating the graphical output" |

| **"graph style data structure"**<br>('519 Patent, Claims 34, 56, 58) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning<br><br>Alternatively:<br>    "Graph styles" define the display characteristics of data. | "a structure that uses a metadata approach whose abstraction is at a level above the particular type of graphic used to display the data"<br><br>Alternatively:<br>    "a structure that (i) uses a metadata approach whose abstraction is at a level above the particular type of graphic used to display the data and (ii) contains graph styles format data and graph styles metadata" |

| **"graph style metadata"** ('519 Patent, Claims 1, 6, 18, 33, 34, 37, 46, 58) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning<br><br>Alternatively:<br>"Graph styles" define the display characteristics of data. | "metadata that is at a level above the particular type of graphic used to display the data and is used independent of the graphic type used to depict the data" |

(Dkt. No. 184, at 2–3; Dkt. No. 189, at 6; Dkt. No. 193, at 2; Dkt. No. 204, at 2–5.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with the following preliminary constructions:

| Term | Preliminary Construction |
|---|---|
| "graph style data item" | "a data item that defines the display characteristics of data and that exists substantially independent of the application generating the data or the application generating the graphical output" |
| "graph style data structure" | "a structure that contains graph styles format data and graph styles metadata" |
| "graph style metadata" | "data that is independent of the graphic type used to depict the data" |

At the January 29, 2020 hearing, Plaintiff agreed with the Court's preliminary constructions for "graph style data item" and "graph style data structure." Defendants agreed as to "graph style data item" but disagreed as to "graph style data structure" (although Defendants submitted that the Court's preliminary construction for "graph style data structure" would be acceptable if the Court adopts Defendants' proposal for "graph style metadata"). The parties presented oral arguments as to "graph style data structure" and "graph style metadata."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "Defendants' proposed constructions not only take liberties with the passages from the specification on which they purport to rely, but those passages lack the classic indicia of intentionally supplied definitions, and are instead merely corroborative of the terms' plain and ordinary meanings." (Dkt. No. 189, at 6.) Plaintiff argues that Defendants propose improperly importing limitations from the specification, and Plaintiff urges that "the words in the claim surrounding the term are helpful to inform the meaning without requiring construction." (*Id.*, at 8.)

As to "graph style data structure," Defendants respond that the "term 'graph style data structure' is not a term of art, and there is therefore no 'plain and ordinary meaning' for it." (Dkt. No. 193, at 6.) Defendants also argue that their proposal tracks relevant disclosure in the specification. (*Id.*, at 7.) Defendants submit an alternative proposed construction to address Plaintiff's argument that Defendants' proposal overlooks certain disclosures in the specification. (*Id.*, at 8.) As to "graph style metadata," Defendants argue that "[t]his claim term is also not a term of art, and there is therefore no 'plain and ordinary meaning' for it." (*Id.*, at 8.) Defendants urge that "the term 'graph style metadata' should be construed according [to] how it is disclosed in the specification . . . ." (*Id.*, at 9.)

Plaintiff replies that "the Federal Circuit has declined to find indefiniteness where the meaning of a claim term may be ascertained from the meaning of individual words." (Dkt. No. 194, at 1–2 (citing *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004) ("the entire term 'surrender value protected investment credits' is not defined in the patent," and the patentee "has not pointed us to any industry publication that defines the term," but term

was not indefinite because "the components of the term have well-recognized meanings, which allow the reader to infer the meaning of the entire phrase with reasonable confidence")).)

(2) Analysis

Claims 1 and 34 of the '519 Patent, for example, recite (emphasis added):

1. A computer-implemented method for generating data graphical displays, comprising the steps of:

receiving data to be displayed in a non-textual format, said received data being indicative of a plurality of variables;

retrieving *graph style data items* from a data file,

said *graph style data items* containing display characteristics to be used in displaying the data in a non-textual format; and

accessing of the *graph style data items* in order to display non-textual formatted output based upon the *graph style data items*;

said *graph style data items* containing *graph style metadata that have descriptors specifying what statistical roles different data variables have within the data*;

wherein the specified statistical roles are used to define display characteristics for the data;

wherein the data is displayed in a non-textual format in accordance with the *graph style data items* and the *graph style metadata*.

* * *

34. A computer-implemented apparatus for generating data graphical displays based upon data, comprising:

a graph generator module that receives data to be displayed in a non-textual format, said received data being indicative of a plurality of variables;

*graph styles data structure* that defines display characteristics to be used in displaying the data in a non-textual format,

said *graph style data structure* containing *graph style metadata that defines display characteristics for data through the metadata associating at least two of the variables with statistical roles*;

said graph generator module having data access to the *graph style data structure*,

said graph generator module generating at least one graphical output based upon the received data, said graphical output being generated in accordance with the defined data characteristics of the *graph styles data structure*.

Defendants do not propose that the specification sets forth any lexicography or disclaimer.

Further, although Defendants argue that the deposition testimony of Plaintiff's expert demonstrates

agreement with Defendants' proposed interpretation, no such agreement is apparent. (*See* Dkt. No. 193, Ex. A, Nov. 19, 2019 Rosenblatt dep. at 11:1–15, 14:4–21, 16:16–17:1, 18:3–19:12 & 31:1–20; *see id.* at 30:7–15 ("In this context graph style metadata is metadata that, for example, has descriptors specifying what statistical roles different data variables have within the data.").) Moreover, to whatever extent Plaintiff's expert can be found to have agreed with Defendants' counsel's assertions as to the specification, the testimony of Plaintiff's expert regarding the specification is extrinsic evidence and is therefore of limited weight. *See Phillips*, 415 F.3d at 1317. The opinions of Defendants' expert are likewise of limited weight. (*See* Dkt. No. 193, Ex. B, Nov. 13, 2019 Jones Decl., at ¶¶ 43–52.)

Defendants urge that these disputed terms are not terms of art, and Plaintiff has not shown otherwise. Nonetheless, as Plaintiff submits, "simply because a phrase as a whole lacks a common meaning does not compel a court to abandon its quest for a common meaning and disregard the established meanings of the individual words." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1372 (Fed. Cir. 2003) (citations omitted). The Court therefore turns to the specification for further understanding of how the patentee used these disputed terms in the claims.

The Background and Summary section of the specification states that "the styles that define the appearance of graphical displays were traditionally *tightly coupled* with the software application generating the graphs," and "[d]ifficulties arose during attempts to use graphical styles defined in one software application in a different software application." '519 Patent at 1:27–33 (emphasis added).

The Detailed Description section of the specification discloses "graph styles data" that defines display characteristics of data and that is "at least substantially *independent* of the application":

*The graph styles data 40 defines the display characteristics 42 of the data 32.* For example, the graph styles data 40 may define the textual label font characteristics or the background display of the graphical output 38. *The graph styles data 40 uses predefined style definitions as well as metadata to determine how input data 32 should be visually depicted in the graphical output 38.*

FIG. 2 shows an example where the graph styles data 40 is stored in a data structure 50 that contains graph styles format data 52 and graph styles metadata 54. The graph styles format data 52 may designate the format attributes for one or more regions of the graphical output 38, such as designating that a graph's axis should display major ticks and not display minor ticks. *The graph styles metadata 54 may designate format attributes based upon the role(s) that a variable has within the input data.*

*The graph styles data 40 exists at least substantially independent of the application generating the data or the application generating the graphical output.* Thus the same graph styles data 40 *may be universally used by multiple software applications* 56 to define the applications' respective graphical output appearance as well as the output type (e.g., HTML, PDF, etc.).

FIG. 3 depicts an example of a graph styles data structure 50. *The graph styles data structure 50 contains graph styles format data 52 and graph styles metadata 54. The format data 52 may include graph font characteristics, graph backgrounds, graph color schemes, etc.* The format data 52 may be at varying levels of detail. For example, the format data 52 may define styles to be used by all components on a graph, such as all bars in a bar chart. It may also define styles on a per graphical component level, such as the first bar in the bar chart should have one type of style, the second bar should have another type of style, and so on. As another example of the varying level of detail, data that are grouped into sets may have its style defined based upon what set the data is in. In this way, the user may better distinguish between sets of data when viewing the graphical output.

The graph styles data structure 40 also contains metadata 54. The *graph styles metadata 54* may designate format attributes based upon the role(s) that a variable has within the input data. For example, a variable may be designated to have as its role in the data set to be the "category" variable.

* * *

It should be understood that *the graph styles data structure uses a metadata approach whose abstraction is at a level above the particular type of graphic used to display the data.* Thus, metadata (such as what role a variable has within a data set and the format style of a variable based upon its role) is used independent of the graphic type used to depict the data.

'519 Patent at 2:22–64 & 5:64–6:3 (emphasis added).

- 13 -

The specification thus provides explanations regarding, and meanings for, the graph style data item, graph style data structure, and graph style metadata. Because, as the parties agree, these terms do not themselves have any well-established meaning in the relevant art, the manner in which the patentee used these terms in the above-reproduced disclosures should be given effect in the Court's constructions. *See Intervet, Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1315) ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification."); *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents.") (internal quotation marks omitted); *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) (citation omitted) ("Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence—the written description and the prosecution history—to obtain the meaning of that term.").

The specification thus explains graph styles data as existing at least substantially independent of the application generating the data or the application generating the graphical output. *See* '519 Patent at 2:38–40. At the January 29, 2020 hearing, the parties agreed with the Court's preliminary construction for the term "graph style data item" (set forth above).

As to "graph style data structure," Defendants' proposal of referring to "a metadata approach whose abstraction is at a level above the particular type of graphic used to display the data," '519 Patent at 5:64–66, is rejected as unclear and as referring to manner of use in particular embodiments rather than the meaning of "graph style data structure" itself. However, the above-

reproduced disclosures explain that a graph style data structure contains graph styles format data and graph styles metadata. *See id.* at 2:45–47.

Likewise, as to Defendants' proposed interpretation of "graph style metadata," the above-reproduced disclosure relied upon by Defendants describes "a metadata approach" rather than the meaning of "graph style metadata" itself. Still, the above-reproduced disclosure explains that graph style metadata is independent of the graphic type used to depict the data. *Id.* at 5:67–6:3. No further construction is necessary, particularly in light of surrounding claim language, for example in above-reproduced Claim 1, reciting "graph style metadata that have descriptors specifying what statistical roles different data variables have within the data."

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| <u>Term</u> | <u>Construction</u> |
|---|---|
| **"graph style data item"** | **"a data item that defines the display characteristics of data and that exists substantially independent of the application generating the data or the application generating the graphical output"** |
| **"graph style data structure"** | **"a structure that contains graph styles format data and graph styles metadata"** |
| **"graph style metadata"** | **"data that is independent of the graphic type used to depict the data"** |

## B. "non-textual format" and "non-textual formatted output"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite |

(Dkt. No. 184, at 3; Dkt. No. 189, at 11; Dkt. No. 193, at 10; Dkt. No. 204, at 6.) The parties submit that these terms appear in Claims 1, 2, 5–9, 12, 14–17, 33, 34, 37–45, and 58 of the '519 Patent. (Dkt. No. 204, at 6.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with its preliminary construction that these terms have their plain meaning and that Claims 13 and 41 of the '519 Patent are indefinite. At the hearing, Plaintiff had no objection to the Court's preliminary construction.

(1) The Parties' Positions

Plaintiff argues that the claims "clearly indicate[] that 'non-textual format' refers to data that is to be displayed graphically or in some form other than a textual format." (Dkt. No. 189, at 11.)

Defendants respond: "Outside of the context of the '519 patent, these terms refer to outputs other than text, such as graphs and charts. But the claims preclude any reasonable understanding of what 'non-textual format' and 'non-textual formatted output' can or cannot be." (Dkt. No. 193, at 10 (citation omitted).) In particular, Defendants point out that "claim 13 lists 'text' as a possible output format." (*Id.*)

Plaintiff replies that Defendants' argument regarding Claim 13 fails because "'output formats' may be textual instructions to an application that is to display the non-textual formatted output." (Dkt. No. 194, at 3.)

<u>(2) Analysis</u>

Claim 34 of the '519 Patent, for example, recites (emphasis added):

> 34. A computer-implemented apparatus for generating data graphical displays based upon data, comprising:
>
> > a graph generator module that receives data to be displayed in a *non-textual format*, said received data being indicative of a plurality of variables;
> >
> > graph styles data structure that defines display characteristics to be used in displaying the data in a *non-textual format*,
> >
> > said graph style data structure containing graph style metadata that defines display characteristics for data through the metadata associating at least two of the variables with statistical roles;
> >
> > said graph generator module having data access to the graph style data structure,
> >
> > said graph generator module *generating at least one graphical output based upon the received data*, said graphical output being generated in accordance with the defined data characteristics of the graph styles data structure.

The Background and Summary section of the specification states:

> Graphical depictions of computer-generated data aid users in their analysis and understanding of the data. Many types of software applications can display data graphs, but the styles that define the appearance of graphical displays were traditionally tightly coupled with the software application generating the graphs. Difficulties arose during attempts to use graphical styles defined in one software application in a different software application. Also, the graphical styles defined within a software application usually were limited to fairly small sets of configurable items, such as background colors.
>
> The present invention overcomes the aforementioned difficulties by providing a computer-implemented system and method for generating data graphical displays. The data is indicative of a plurality of variables. The system and method receive data that is to be displayed in a *non-textual format*. Graph style data items are retrieved that contain display characteristics for displaying the data in the *non-textual format*. The data is displayed in accordance with the graph style data items.

'519 Patent at 1:26–45 (emphasis added). This discussion uses "non-textual format" in the context of "graphs," "graphical styles," and "graphical displays." *See id.* The Detailed Description section of the specification likewise refers to "non-textual output" in the context of graphic output. *See id.* at 6:4–30.

The parties have discussed Claim 13 of the '519 Patent, which depends from Claim 12, which in turn depends from Claim 1. Claims 1, 12, and 13 of the '519 Patent recite (emphasis added):

> 1. A computer-implemented method for generating data graphical displays, comprising the steps of:
>
> receiving data to be displayed in a *non-textual format*, said received data being indicative of a plurality of variables;
>
> retrieving graph style data items from a data file,
>
> said graph style data items containing display characteristics to be used in displaying the data in a *non-textual format*; and
>
> accessing of the graph style data items in order to display *non-textual formatted output* based upon the graph style data items;
>
> said graph style data items containing graph style metadata that have descriptors specifying what statistical roles different data variables have within the data;
>
> wherein the specified statistical roles are used to define display characteristics for the data;
>
> wherein the data is displayed in a *non-textual format* in accordance with the graph style data items and the graph style metadata.
>
> * * *
>
> 12. The method of claim 1 wherein the graph style data items specify different *output formats* based upon the type of software application that is to display the *non-textual formatted output*.
>
> 13. The method of claim 12 wherein the *output formats* include formats selected from the group consisting of HTML, XML, PDF, and *text*.

A fair reading of these claims is that "output format" refers to types of outputs that may *include* "non-textual formatted output." Claim 13 recites "text" as an example of an output format that is "to display the non-textual formatted output" (as recited in Claim 12). This recital in Claim 13 of "text" being used to "display the non-textual formatted output" is internally inconsistent. Plaintiff attempts to resolve this inconsistency by arguing that "'output formats' may be textual *instructions* to an application that is to display the non-textual formatted output." (Dkt. No. 194, at 3.) Plaintiff fails to support this contention, and the disclosures cited by Plaintiff are

unpersuasive. *See* '519 Patent at 2:40–44 ("output type (e.g., HTML, PDF, etc.)"); *see also id.* at 8:63–9:4 ("The output format may be based upon the entity that is to receive the graphical output. For example, if the business application is being operated through a web browser, then the graph styles data can indicate that certain styles are to be used when rendering graphics for a web browser as well as *indicate that the output should be in an HTML format*.") (emphasis added). The opinions of Plaintiff's expert are likewise unpersuasive. (*See* Dkt. No. 189-14, Nov. 17, 2019 Am. Rosenblatt Decl., at ¶¶ 57–64.)

But rather than rendering the disputed terms indefinite, this internal inconsistency merely results in dependent Claim 13 being indefinite. *See Competitive Techs., Inc. v. Fujitsu Ltd.*, 185 F. App'x 958, 965–66 (Fed. Cir. 2006). The same analysis applies to dependent Claim 41 of the '519 Patent.

As to the other claims here at issue, Defendants fail to demonstrate any lack of "reasonable certainty" as to the meanings of the disputed terms "non-textual format" and "non-textual formatted output." *See Nautilus*, 572 U.S. at 901; *see also Sonix*, 844 F.3d at 1377. Defendants' reliance on purportedly contradictory testimony of Plaintiff's expert is unpersuasive. (*See* Dkt. No. 193, Ex. A, Nov. 19, 2019 Rosenblatt dep. at 36:7–15 & 40:1–11; *see also id.* at 38:13–39:10.) The opinions of Defendants' expert are likewise unpersuasive. (*See id.*, Ex. B, Nov. 13, 2019 Jones Decl., at ¶¶ 53–56.) The Court therefore expressly rejects Defendants' indefiniteness arguments, and no further construction is necessary. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo*

*Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court accordingly hereby finds that **Claims 13 and 41 of the '519 Patent** are **indefinite**. The Court otherwise hereby construes **"non-textual format"** and **"non-textual formatted output"** to have their **plain meaning**.

**C. "wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a response role, said category role and said response role being used by in different output non-textual formats"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a response role, said category role and said response role being used *to generate* different output non-textual formats"[1]<br><br>Alternatively:<br>    Interpret to remove extraneous word "in" so that claim reads "…being used *by* different output non-textual formats." | Indefinite |

(Dkt. No. 184, at 4; Dkt. No. 189, at 12–13; Dkt. No. 193, at 12; Dkt. No. 204, at 7.) The parties submit that this term appears in Claim 37 of the '519 Patent. (Dkt. No. 204, at 7.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with the following preliminary construction: "wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a response role, said category role and said response role being used by different output non-textual formats." At the hearing, Plaintiff agreed with the Court's preliminary construction.

---

[1] Plaintiff previously proposed: "Plain and ordinary meaning." (Dkt. No. 189, at 12.)

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[t]h[e] obvious typographical error does not impair an understanding of the claim; the claim can easily be interpreted, and is not indefinite." (Dkt. No. 189, at 13.) Plaintiff submits: "Regardless of whether the drafter meant to say that the category role and response role are used 'by' or 'in' different output non-textual formats, the meaning of this phrase is the same: data having a category role and data having a response role—as identified by the graph style metadata—*is used* when displaying that data in bar charts, pie charts, graphs, scatter plots, and so on (*i.e.*, 'by' and/or 'in' the 'different output non-textual formats')." (*Id.*, at 14.) Finally, Plaintiff argues that "[t]he prosecution history does not suggest a different interpretation." (*Id.*, at 15.)

Defendants respond that because "[t]he way in which the error should be fixed . . . is not obvious at all" and is "subject to reasonable debate," the claim cannot be judicially corrected. (Dkt. No. 193, at 12.)

Plaintiff replies: "Defendants have not shown any difference in scope between the possible clarifying constructions. The Court should correct the error and move on." (Dkt. No. 194, at 4.)

At the January 29, 2020 hearing, Defendants argued that there is a significant difference in meaning between "by" and "in" because whereas "by" would mean that the roles can affect how output is displayed, "in" would require the roles themselves to be rendered and visible.

<u>(2) Analysis</u>

Judicial correction of an error in a patent may be available "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003); *see LG Elecs., Inc. v.*

*Quanta Comput. Inc.*, 566 F. Supp. 2d 910, 913 (W.D. Wis. 2008) (citing *Novo*, 350 F.3d 1348, which "refus[ed] to correct 'a' to 'and' because other possibilities for correction existed") (noting the "nearly impossible standard for judicial correction of a patent").

Claim 37 of the '519 Patent depends from Claim 34, and Claims 34 and 37 recite (emphasis added):

> 34. A computer-implemented apparatus for generating data graphical displays based upon data, comprising:
> a graph generator module that receives data to be displayed in a non-textual format, said received data being indicative of a plurality of variables;
> graph styles data structure that defines display characteristics to be used in displaying the data in a non-textual format,
> said graph style data structure containing *graph style metadata* that defines display characteristics for data through the metadata associating at least two of the variables with *statistical roles*;
> said graph generator module having data access to the graph style data structure,
> said graph generator module generating at least one graphical output based upon the received data, said graphical output being generated in accordance with the defined data characteristics of the graph styles data structure.
>
> * * *
>
> 37. The apparatus of claim 34 wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a response role, said category role and said response role being used *by in* different output non-textual formats.

Defendants fail to demonstrate any substantive difference between "said category role and said response role being used *by* different output non-textual formats" and "said category role and said response role being used *in* different output non-textual formats." Nothing in the claim language suggests any difference.

The specification discloses that data for category and response variables may be displayed differently for different output formats. *See* '519 Patent at 5:27–63; *see also id.* at 3:5–14.

Defendants cite the following disclosures as purportedly demonstrating a difference between "by" and "in" in this context:

> An aspect of a graph may be formatted based upon a combination of graph styles data associated with a variable and the variable's role. For example, a variable's role may be designated as the dependent variable of a graph. The variable may also be designated to be displayed with a bluish color.
>
> * * *
>
> The horizontal axis 260 also shows the display of the variable whose role is category (i.e., the Year31 variable has as its role the category and thus is displayed as the variable for the horizontal axis 260). Correspondingly, the vertical axis 262 has its format and associated variable shown in accordance with the Axis1 tags 204. Thus, the vertical axis label "sales" 264 is shown in accordance with the Axis1 tags 204.

'519 Patent at 3:12–16 & 5:46–53. Figure 5 of the '519 Patent is reproduced here:



**FIG. 5**

Figure 5 includes the labels "Sales" and "Year," which Defendants argue is an instance of category and response roles being used *in* an output non-textual format. On balance, however, Defendants fail to demonstrate any difference in meaning between "by" and "in" in the context of

the data variables and roles recited in above-reproduced Claim 34. The claims here at issue do not refer to any labels, and Defendants identify nothing in the specification suggesting that the appearance or non-appearance of such labels is of any significance in the context of these claims. Indeed, the disputed term refers to the roles "being used by in different output non-textual *formats*," not necessarily in the *output* itself.

Thus, "the correction is not subject to reasonable debate based on consideration of the claim language and the specification." *Novo*, 350 F.3d at 1357; *see CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358–61 (Fed. Cir. 2011) (construing "detect analyze" to mean "detect and analyze"); *see also Intermec Techs. Corp. v. Palm Inc.*, 811 F. Supp. 2d 973, 985 (D. Del. 2011) (deleting extraneous word).

As to the prosecution history, Plaintiff submits that the patent examiner raised no issue with the recital of "by in." Instead, the examiner used the word "by" when referring to this limitation. (*See* Dkt. No. 189-7, Ex. B, Mar. 29, 2004 Office Action, at 5 (p. 58 of 65 of Ex. B); *see also id.*, Oct. 19, 2004 Office Action, at 5 (p. 44 of 65 of Ex. B); *id.*, Apr. 6, 2006 Office Action, at 14 (p. 8 of 65 of Ex. B).) Thus, "the prosecution history does not suggest a different interpretation of the claims." *Novo*, 350 F.3d at 1357.

Finally, the opinions of the parties' experts do not significantly affect the Court's analysis. (*See* Dkt. No. 189-14, Nov. 17, 2019 Am. Rosenblatt Decl., at ¶¶ 75–78; *see also* Dkt. No. 193, Ex. B, Nov. 13, 2019 Jones Decl., at ¶¶ 57–60.) Likewise, the deposition testimony of Plaintiff's expert, cited by both sides, does not significantly affect the Court's analysis. (*See* Dkt. No. 193, Ex. A, Nov. 19, 2019 Rosenblatt dep. at 52:4–54:12.)

The Court therefore hereby construes **"wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a**

response role, said category role and said response role being used by in different output non-textual formats" to mean **"wherein the graph style metadata identifies a data variable as having a category role and identifies another data variable as having a response role, said category role and said response role being used by different output non-textual formats."**

**D. "the graph generator module"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning.<br><br>35 U.S.C. § 112 ¶ 6 does not apply. | Indefinite.<br><br>35 U.S.C. § 112 ¶ 6 applies.<br><br>Function(s):<br>    "receives data to be displayed in a non-textual format; having data access to the graph style data structure; generating at least one graphical output based upon the received data"<br><br>Structure:<br>    None |

(Dkt. No. 184, at 4–5; Dkt. No. 189, at 15; Dkt. No. 193, at 13; Dkt. No. 204, at 8.) The parties submit that this term appears in Claims 34, 52, 53, and 58 of the '519 Patent. (Dkt. No. 204, at 8.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with its preliminary construction that 35 U.S.C. § 112 ¶ 6 does not apply and that this term has its plain meaning.

(1) The Parties' Positions

Plaintiff argues that "[t]his term should not be construed according to § 112, ¶ 6 because the term has a plain and ordinary meaning; it refers to software applications, used to generate graphs, that were existing in the art at the time of the invention." (Dkt. No. 189, at 15.) Also, Plaintiff submits that "the claims describe how the graph generator module is to generate a graph

in a particular way, thus describing the objectives and operations for the apparatus." (*Id.*, at 16–17.)

Defendants respond that "[t]he claim term at issue here—'graph generator module'—is not understood by persons of skill as the name for structure" and "is not a term of art." (Dkt. No. 193, at 14.) Defendants also argue that "the corresponding structure is software that cannot be performed by a general-purpose computer" and "the '519 patent provides no algorithm—and therefore no corresponding structure—for performing the recited functions." (*Id.*, at 15–16.)

Plaintiff replies that "the term is not used as generic terms or black box recitations of structure or abstractions, but rather as a specific reference to components that are known in the art." (Dkt. No. 194, at 5.)

(2) Analysis

The disputed term appears in independent Claims 34 and 58 of the '519 Patent, which recite (emphasis added):

> 34. A computer-implemented apparatus for generating data graphical displays based upon data, comprising:
>     a *graph generator module* that receives data to be displayed in a non-textual format, said received data being indicative of a plurality of variables;
>     graph styles data structure that defines display characteristics to be used in displaying the data in a non-textual format,
>     said graph style data structure containing graph style metadata that defines display characteristics for data through the metadata associating at least two of the variables with statistical roles;
>     said *graph generator module* having data access to the graph style data structure,
>     said *graph generator module* generating at least one graphical output based upon the received data, said graphical output being generated in accordance with the defined data characteristics of the graph styles data structure.
>
> * * *
>
> 58. A computer-implemented apparatus for generating data graphical displays based upon data, comprising:

a *graph generator module* that receives data to be displayed in a non-textual format, said received data being indicative of a plurality of variables;

graph styles data structure that defines display characteristics to be used in displaying the data in a non-textual format,

said graph style data structure containing graph style metadata that define display characteristics for data through the metadata associating at least two of the variables with statistical roles;

said *graph generator module* having data access to the graph style data structure,

said *graph generator module* generating at least one graphical output based upon the received data, said graphical output being generated in accordance with the defined data characteristics of the graph styles data structure;

a server-side computer system that contains the graph styles data structure,

said server-side computer system generating graphic outputs based upon requests received through an internet network from a client web application,

said generated graphic outputs having display characteristics that are based upon the graph styles data structure;

wherein graph style information contained within the graph styles data structure is accessible by different types of software applications in order to display through the different types of software applications non-textual formatted output based upon the graph style information;

wherein the different types of software applications include at least two applications selected from the group consisting of a document creation and editing application, a web browser application, and a statistical software application.

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014) (citation omitted).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citation omitted). "When a claim term lacks the word 'means,' the presumption can be overcome

and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (citation and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* at 1349. (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World* . . . ." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)). In a subsequent part of the decision not considered *en banc*, *Williamson* affirmed the district court's finding that the term "distributed learning control module" was a means-plus-function term that was indefinite because of lack of corresponding structure, and in doing so *Williamson* stated that "'module' is a well-known nonce word." 792 F.3d at 1350.

But although *Williamson* found that "module" is a "nonce word," *Williamson* noted also that "the presence of modifiers can change the meaning of 'module.'" *Id.* at 1351. In the claims at issue here, the modifier "graph generator" connotes structure in the relevant art, and it is also noteworthy that the claims refer to a "computer-implemented" apparatus. The opinions of Plaintiff's expert are persuasive in this regard. (*See* Dkt. No. 189-14, Nov. 17, 2019 Rosenblatt Decl., at ¶¶ 79–81.) The deposition testimony of Plaintiff's expert, cited by Defendants, does not compel otherwise. (*See* Dkt. No. 193, Ex. A, Nov. 19, 2019 Rosenblatt dep. at 56:11–15, 57:24–58:16, 60:23–61:1 & 61:11–16.) Also, Plaintiff cites authority that computer "code" connotes

structure. *See, e.g., Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) (finding that "user interface code" and "program" were not nonce words; noting that "the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions"); *Trading Techs. Int'l, Inc. v. IBG LLC*, No. 10 C 715, 2019 WL 6609428, at *6 (N.D. Ill. Dec. 5, 2019) (Kendall, J.) ("'program code' is not merely a nonce word but does claim sufficient structure"). The contrary opinions of Defendants' expert are unpersuasive. (*See* Dkt. No. 193, Ex. B, Nov. 13, 2019 Jones Decl., at ¶¶ 61–64.)

Further, surrounding claim language recites "how the '[graph generator] module' interacts with other components . . . in a way that . . . inform[s] the structural character of the limitation-in-question." *Williamson*, 792 F.3d at 1351; *see* '519 Patent at Cl. 34 (reciting that "graph generator module . . . receives data to be displayed in a non-textual format" and has access to the graph style data structure which "defines display characteristics to be used in displaying the data in a non-textual format"); *see also Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (finding "wireless device means" not a means-plus-function term, noting that "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function") (quoting *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)); *cf. Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 7770208, at *10–11 (N.D. Cal. Dec. 3, 2015) ("content processor" had specific structure because the claim described interaction with the transmitter and receiver, and because the specification identified the component's location).

This finding is consistent with principles articulated by the Federal Circuit prior to the abrogated *Lighting World* decision. *See Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580,

1583 (Fed. Cir. 1996) (finding that "detent mechanism" was not a means-plus-function term because "'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms"; "It is true that the term 'detent' does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as 'clamp' or 'container.' What is important is not simply that a 'detent' or 'detent mechanism' is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art."); *see also Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–21 (Fed. Cir. 2004) (in finding "first circuit," "second circuit," and "third circuit" were not means-plus-function terms, noting "language reciting their respective objectives or operations"); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.'").

Defendants urge that the specification fails to provide algorithms and otherwise fails to disclose how a graph generator functions, but these arguments are unpersuasive because they are directed to issues not directly relevant here, such as perhaps enablement, written description, or sufficiency of corresponding structure:

> The overall means-plus-function analysis is a two-step process. Naturally, there is some analytical overlap between these two steps. In the first step, we must determine if the claim limitation is drafted in means-plus-function format. As part of this step, we must construe the claim limitation to decide if it connotes "sufficiently definite structure" to a person of ordinary skill in the art, which requires us to consider the specification (among other evidence). In the second step, if the limitation is in means-plus-function format, we must specifically review the specification for "corresponding structure." Thus, *while these two "structure" inquiries are inherently related, they are distinct*.

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296 (Fed. Cir. 2014) (emphasis added), *overruled on other grounds by Williamson*, 792 F.3d 1339.

At the January 29, 2020 hearing, Defendants also emphasized *Altiris*, in which the Federal Circuit stated that "merely pointing out that the relevant structure is software rather than hardware is insufficient." 318 F.3d at 1376. Yet, the Federal Circuit then explained in the next sentence that "'commands' (*i.e.*, software) is so broad as to give little indication of the particular structure used here and is described only functionally . . . ." *Id.* In the present case, as discussed above, the opinion of Plaintiff's expert is persuasive that the modifier "graph generator" connotes structure in the relevant art (*see* Dkt. No. 189-14, Nov. 17, 2019 Rosenblatt Decl., at ¶ 79), and surrounding claim language recites "how the '[graph generator] module' interacts with other components . . . in a way that . . . inform[s] the structural character of the limitation-in-question." *Williamson*, 792 F.3d at 1351; *see* '519 Patent at Cl. 34 (reciting that "graph generator module . . . receives data to be displayed in a non-textual format" and has access to the graph style data structure which "defines display characteristics to be used in displaying the data in a non-textual format"); *see also Zeroclick*, 891 F.3d at 1008. The contrary opinions of Defendants' expert are unpersuasive. (*See* Dkt. No. 193, Ex. B, Nov. 13, 2019 Jones Decl., at ¶¶ 61–64.)

The Court therefore finds that the disputed term is not governed by 35 U.S.C. § 112, ¶ 6, and Defendants submit no alternative proposed construction. The Court accordingly rejects Defendants' indefiniteness argument, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation

present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.[2]

Based on all of the foregoing, the Court hereby construes **"the graph generator module"** to have its **plain meaning**.

## V. DISPUTED TERMS IN U.S. PATENT NO. 7,447,686

The '686 Patent, titled "Computer-Implemented System and Method for Handling Database Statements," issued on November 4, 2008, and bears a filing date of November 22, 2002. *See* Dkt. No. 189-2 at 2. The Abstract of the '686 Patent states:

> A computer-implemented system and method for handling a database statement from a first database system. The database statement is formatted according to a language format used by the first database system. Database language difference data is accessed so that a database specific statement may be generated which is operational within a different type of database system.

### E. "a superset of the SQL standard"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>　To be a superset of the SQL standard, a database system's query language format must be capable of processing all standard SQL queries, plus *possibly* others. | "a set that includes all of the SQL standard and additional elements not in the SQL standard" |

(Dkt. No. 184, at 5; Dkt. No. 189, at 17; Dkt. No. 193, at 17; Dkt. No. 204, at 9.) The parties submit that this term appears in Claims 27 and 28 of the '686 Patent. (Dkt. No. 204, at 9.)

---

[2] Alternatively, if 35 U.S.C. § 112, ¶ 6 were found to apply, the term is not indefinite because the specification discloses corresponding structure, namely the "graph generator software module 36." *See* '519 Patent at 2:16–28.

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with the following preliminary construction: "a set that includes all of the features of the SQL standard and that may also include additional features."

At the hearing, the parties had no objection to the Court's preliminary construction. The Court therefore hereby construes **"a superset of the SQL standard"** to mean **"a set that includes all of the features of the SQL standard and that may also include additional features."**

**F. "wherein the first component software object is associated with a first method to textualize," "wherein a first software driver textualizes through a second method," and "wherein a second software driver textualizes through a third method"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

(Dkt. No. 184, at 6; Dkt. No. 189, at 18; Dkt. No. 193, at 19; Dkt. No. 204, at 10.) The parties submit that these terms appear in Claim 1 of the '686 Patent. (Dkt. No. 204, at 10.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with its preliminary construction that these terms have their plain meaning.

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[b]ecause Defendants have ignored the specification's numerous examples of applicable methods, Defendants fall far short of establishing by clear and convincing evidence that these limitations are indefinite." (Dkt. No. 189, at 18.)

Defendants respond that "[t]he claim does not define or specify what these 'methods' for textualizing are" and "[t]hese unspecified 'methods' are facially indefinite." (Dkt. No. 193, at 19.) Alternatively, Defendants argue that "even under § 112(f), these claim terms would still be indefinite because the specification of the '698 patent discloses no corresponding structure." (*Id.*, at 21.)

Plaintiff replies that Defendants' reliance on deposition testimony of Plaintiff's expert is unavailing. (*See* Dkt. No. 194, at 7.) Plaintiff also urges that "[m]erely being a method claim, or claiming a method as a limitation, does not *ipso facto* mean that a claim or term is governed by the 'step-plus-function' provisions of § 112(f)." (*Id.*, at 8.)

<u>(2) Analysis</u>

Claim 1 of the '686 Patent recites, for example, "wherein the first component software object is associated with *a first method* to textualize, into fourth-generation database language text, the first component software objects associated logical piece that is contained in the tree."

The specification discloses:

> The textualization process 50 compartmentalizes an SQL statement 32 into logical text pieces or components which are initially provided based on a default SQL dialect. * * * The textualization process 50 allows a SAS SQL statement to be converted into a third party vendor-specific SQL in order to successfully submit a table request to the third party's relational database system (RDBMS). This is accomplished by representing the SAS SQL statement as an SQL tree 60. The SQL tree 60 is passed to the textualization process 50 to convert the tree 60 into the text of the third party vendor specific SQL query, taking into account any DBMS-specific SQL.

> * * *

> *In order to textualize for multiple different types of database systems*, different drivers (110, 112) are associated with different third party platforms. For example, a first driver object 110 might point a component object 102 to use an "override" 108 to the default *method* 106 so that the component object 102 may textualize an SQL statement that can be used within a Sybase datasource system. A second driver object 114 might point the component object 102 to use an "override" 116 to the default *method* 106 so that the component object 102 may textualize an SQL statement that can be used within an Oracle datasource system.

> The net effect of this object-oriented mechanism 100 is a driver-customized set of components where the driver need only supply an override *method* when a specific SQL construct differs from the default SAS SQL syntax.

'686 Patent at 3:12–29 & 4:1–15 (emphasis added); *see id.* at 2:62–67; *see also id.* at 8:65–9:2.

As to Defendants' arguments under 35 U.S.C. § 112, ¶ 2, the above-cited disclosures provide context for understanding the word "method" as part of textualization processes. Defendants fail to demonstrate any lack of reasonable certainty as to the word "method." The deposition testimony of Plaintiff's expert, cited by Defendants, does not compel finding otherwise. (*See* Dkt. No. 193, Ex. A, Nov. 19, 2019 Rosenblatt dep. at 71:7–13, 72:14–73:22 & 74:2–9.) Also, the opinions of Defendants' expert in this regard are unpersuasive. (*See* Dkt. No. 193, Ex. B, Nov. 13, 2019 Jones Decl., at ¶¶ 67–71.)

As to Defendants' arguments under 35 U.S.C. § 112, ¶ 6, the claim does not use the word "step," and Defendants fail to demonstrate that the appearance of the word "method" in the body of a claim gives rise to any inference that 35 U.S.C. § 112, ¶ 6 applies. Defendants point to Plaintiff's reliance on disclosures in the specification as being a concession that 35 U.S.C. § 112, ¶ 6 applies, but analysis of whether 35 U.S.C. § 112, ¶ 6 applies and analysis of sufficiency of disclosure under 35 U.S.C. § 112, ¶ 6 are "distinct" inquiries. *Apple*, 757 F.3d at 1296. Defendants' arguments may perhaps bear upon issues of enablement or written description but do not present any issue for claim construction. *See Phillips*, 415 F.3d at 1327 ("we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction").

The Court therefore rejects Defendants' indefiniteness argument, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"wherein the first component software object is associated with a first method to textualize," "wherein a first software driver textualizes**

**through a second method,"** and **"wherein a second software driver textualizes through a third method"** to have their **plain meaning**.

## VI. DISPUTED TERMS IN U.S. PATENT NO. 8,498,996

The '996 Patent, titled "Computer-Implemented Method and System for Handling and Transforming Database Queries in a Fourth Generation Language," issued on July 30, 2013, and bears a filing date of November 3, 2008. *See* Dkt. No. 189-3 at 2. The Abstract of the '996 Patent states:

> A computer-implemented method and system allows generating a query and a first fourth generation language at a native system to a non-native database which is capable of processing queries in a second fourth generation language. A query initiated by a client applicant in a first fourth generation language is analyzed to determine if it can be processed by a non-native system capable of processing queries in a second fourth generation language. Non-standard syntax representative of a function and the query that cannot be evaluated by the non-native database system is identified. If the syntax is discovered, the query is transformed through the use of formats or through an algorithm process into an equivalent query expression that can be processed by the database system.

### G. "native" and "non-native"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning<br><br>Alternatively:<br>    A "non-native" database system is one that uses a different query syntax from the "native" database system. | Indefinite |

(Dkt. No. 184, at 7–8; Dkt. No. 189, at 21–22; Dkt. No. 193, at 24; Dkt. No. 204, at 12.) The parties submit that these terms appear in Claims 1–3, 5–7, 9, 10, 12–14, 19–21, 23–25, 27, 28, 30–32, 37–39, 41–43, 45, 46, and 48–50. (Dkt. No. 204, at 12.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with its preliminary construction that "native" means "relating to a system that uses a first language"

and "non-native" means "relating to a system that uses a second language, different from the first language."

At the hearing, the parties had no objection to the Court's preliminary constructions. The Court therefore hereby construes these terms as set forth in the following chart:

| Term | Construction |
|------|-------------|
| **"native"** | **"relating to a system that uses a first language"** |
| **"non-native"** | **"relating to a system that uses a second language, different from the first language"** |

## VII. DISPUTED TERMS IN U.S. PATENT NO. 6,920,458

The '458 Patent, titled "Model Repository," issued on July 19, 2005, and bears a filing date of September 22, 2000. *See* Dkt. No. 189 at 1. The Abstract of the '458 Patent states:

A model repository is provided for storing selected data models generated by a data mining application. The model repository is a structure that may be organized into a plurality of levels, including a project level, a diagram level, and a model level. The project level may include one or more diagrams, each of which describes a particular set of model specifications. Each diagram may then be associated with one or more models. Associated with the model repository is a model repository facility that is preferably integrated into the data mining application and enables operations, such as the exportation of useful models to the model repository. The model repository may also include one or more index data structures for storing attributes of the models within the model repository. These indexes may include a main index that contains attributes of all the models stored in the model repository, and one or more special indexes, such as a tree-type index and mini-index, that contain the attributes of a particular sub-set of the models stored in the model repository. A user may then search through the one or more indexes in order to find a model that suits his or her needs. Alternatively, a user application program may programmatically query the model repository in order to find and extract information from a particular model stored in the model repository.

## H. "data model"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>A set of attributes related to the run of a data mining application. | "a set of attributes related to the run of a data mining application, including the name and location of the data set that was analyzed and the resulting analysis" |

(Dkt. No. 184, at 9; Dkt. No. 189, at 24; Dkt. No. 193, at 26; Dkt. No. 204, at 14–15.) The parties submit that this term appears in Claims 1–6, 11, 24, 25, 28, 61, 63–68, 72, 85, 86, and 89 of the '458 Patent. (Dkt. No. 204, at 14–15.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with the following preliminary construction: "a set of attributes related to the run of a data mining application (or another type of statistical-related software application) and the resulting analysis."

At the hearing, the parties had no objection to the Court's preliminary construction. The Court therefore hereby construes **"data model"** to mean **"a set of attributes related to the run of a data mining application (or another type of statistical-related software application) and the resulting analysis."**

## I. "index structure"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a pre-determined structure within the model repository for storing and indexing the generated data models to allow search and retrieval of the generated data models" |

(Dkt. No. 184, at 9; Dkt. No. 189, at 26; Dkt. No. 193, at 26; Dkt. No. 204, at 16.) The parties submit that this term appears in Claims 1, 4, 5, 11, 15, 26–28, 61, 65, 66, 68, 72, 76, and 87–89 of the '458 Patent. (Dkt. No. 204, at 16.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with its preliminary construction of this term as having its plain meaning and expressly rejecting Defendants' proposals of "pre-determined" and "to allow search and retrieval."

(1) The Parties' Positions

Plaintiff argues that "Defendants' proposed construction, requiring 'indexing the generated data models,' which is claimed separately in claim 1 and unasserted claims 29 and 41, is redundant." (Dkt. No. 189, at 26.) Further, Plaintiff argues, "[i]t is well known that indexes are mechanisms that may be used for search and retrieval, but this does not need to be included in an express construction." (*Id.*, at 28.)

Defendants respond that "Defendants' proposed construction is fully supported by the arguments SII made in prosecution." (Dkt. No. 193, at 27.)

Plaintiff replies that "*attributes* of the models are stored in the index structure, not the models themselves." (Dkt. No. 194, at 9.) Plaintiff also argues that "Defendants' construction impermissibly limits 'index structure' to only index structures that are static and cannot be created, built, or updated, rather than being 'predetermined' only as of the time that attributes are stored in the index." (*Id.*)

(2) Analysis

Claims 1 and 27 of the '458 Patent, for example, recite (emphasis added):

1. A model repository system, comprising:
    a data store for storing a plurality of data records;
    a data mining application for analyzing the data records and for generating a plurality of data models; and
    a model repository for storing the generated data models, wherein the model repository includes one or more *index structures* containing a plurality of attributes associated with the data models;
    wherein the data models are predictive data models;

wherein the predictive data models are the entities being indexed by the one or more *index structures* such that the attributes of the predictive data models are stored within the one or more indexes;

a model repository facility for exporting the generated data models to the model repository;

at least three configuration files stored in the model repository, wherein a first configuration file stores information that is used by the model repository facility in exporting the generated data models to the model repository, and second and third configuration files store information that is used by the model repository system in building the main index in the model repository from attributes supplied by human end users and from the data mining application.

* * *

27. The model repository system of claim 1, wherein the model repository facility builds the index structures stored in the model repository after one or more selected models have been exported to the model repository.

Claim 1 thus recites that "*attributes* of the predictive data models are stored within the one or more indexes." The specification discloses, for example:

At step 258, the model descriptions (or attributes) that are associated with the selected model and permitted by the column info in step 215 are obtained from the model in the model repository 24. Step 264 then creates a new data record that includes those model attributes, the model's folder name, and the export time. At step 266, this new data record is then appended to the main-type index 26, and results in a new row in the main index table 26, as shown in FIG. 3.

'458 Patent at 14:40–47; *see id.* at Fig. 1. Defendants' proposal of "storing and indexing the generated data *models*," rather than attributes, is therefore inconsistent with the intrinsic evidence.

Further, nothing in the claim language or the specification suggests that an "index structure" must be "predetermined" or static, and none of the evidence cited by Defendants supports such a limitation. Defendants submit that, during prosecution, the patentee argued as follows regarding the "Myers" reference (United States Patent No. 5,832,450):

Claim 1's predictive data model and its attributes are *not* the actor/agent of determining a database's structure (as Myers' database model is), but rather claim 1's predictive data model attributes are the entities actually being stored in the already determined index structures.

(Dkt. No. 193, Ex. C, May 26, 2004 Responsive Amendment, at 24 (p. 5 of 15 of Ex. C).)

Defendants have not shown how this statement by the patentee purportedly requires a "predetermined" index structure. Plaintiff persuasively argues that "Defendants' construction impermissibly limits 'index structure' to only index structures that are static and cannot be created, built, or updated, rather than being 'predetermined' only as of the time that attributes are stored in the index." (Dkt. No. 194, at 9.) The Court finds that an "index structure" need not be a static, unchanging structure. Nonetheless, the recital for example in above-reproduced Claim 1 of "a model repository for storing the generated data models, wherein the model repository includes one or more index structures containing a plurality of attributes associated with the data models," demonstrates that an "index structure" has an independent existence and does not arise merely by storing a data model.

As to Defendants' proposal of "to allow search and retrieval of the generated data models," the patentee argued during prosecution:

> The Office Action maintains "Myers teaches indexing a computerized repository by the attributes associated with its stored data models ..." (See Office Action, page 5). Applicants respectfully disagree. The Myers reference does not disclose, teach or suggest data models being indexed and retrieved. For example, the Myers reference involves a significantly different model than what is recited in claim 1. The Myers reference discusses using an "object-oriented database model" to more easily store medical record information. (See the Myers reference, column 6, lines 14-29). *The object-oriented database model of Myers shows how medical record information can be stored and indexed, but the object-oriented database model itself is not indexed and is not the item that is retrieved (as in the case of the predictive data models recited in claim 1).*
>
> Moreover, the Myers reference uses only a single object-oriented database model. There are no multiple database models that the user would need to search and then select. In this respect, the Myers reference is directed to a significantly different problem than Applicants' claimed invention. In other words, Applicants' invention allows the management of a "multitude of data models" that are generated from a data mining application as well as allow others who are unfamiliar with the data models to determine "which models are available, and which ones are useful." (See Applicants' specification, page 4, lines 10-11). The Myers reference does not

> provide a *searching mechanism* to determine which object-oriented database model is relevant because Myers is dealing with only a single object-oriented database model.

(Dkt. No. 193, Ex. C, May 27, 2003 Responsive Amendment, at 18–19 (p. 12 of 15 of Ex. C) (emphasis modified).) This statement by the patentee regarding a "searching mechanism" does not amount to a definitive statement requiring that an "index structure" must provide a "searching mechanism." *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (emphasis added) (citation omitted) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution."). Indeed, the patentee explained that Myers dealt with indexing information within a model, not indexing the model itself.

At the January 29, 2020 hearing, Defendants expressed concern that Plaintiff might interpret "index structure" as being met by a portion of a data model. Defendants urged that simply saving a data model, and later being able to retrieve it, is insufficient. Plaintiff replied by acknowledging that an "index structure" needs to be something distinguishable from the data model itself. Indeed, the Court finds that the words "index" and "structure," individually and especially in combination, connote a structure distinct from a data model itself.

With this understanding, the Court hereby expressly rejects Defendants' proposed construction, and no further construction is necessary. *See O2 Micro*, 521 F.3d at 1362; *see also Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"index structure"** to have its **plain meaning**.

## J. "model repository facility"

| "model repository facility" ('458 Patent, Claims 1, 3, 61, 64) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning.<br><br>35 U.S.C. § 112 ¶ 6 does not apply. | 35 U.S.C § 112 ¶ 6 applies.<br><br>Function:<br>   "exporting the generated data models to the model repository"<br><br>Structure:<br>   "Steps 112 through 141 of Figs 7A through 7C" |
| "model repository facility" ('458 Patent, Claims 27, 88) | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning.<br><br>35 U.S.C. § 112 ¶ 6 does not apply. | 35 U.S.C § 112 ¶ 6 applies.<br><br>Function:<br>   "building the index structures stored in the model repository"<br><br>Structure:<br>   "Figs 8A through 8C" |
| "model repository facility" ('458 Patent, Claims 9, 70) | |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning.<br><br>35 U.S.C. § 112 ¶ 6 does not apply. | No additional construction. |

(Dkt. No. 184, at 10–11; Dkt. No. 189, at 28; Dkt. No. 204, at 18–19.)

Shortly before the start of the January 29, 2020 hearing, the Court provided the parties with its preliminary construction that 35 U.S.C. § 112 ¶ 6 does not apply and that this term has its plain meaning.

(1) The Parties' Positions

Plaintiff highlights the presumption against applying 35 U.S.C. § 112, ¶ 6 to a term that does not include the word "means," and Plaintiff argues that "[t]here is a simple resolution to the complexity fostered by Defendants' proposed constructions: 'model repository facility' is not a § 112, ¶ 6 term." (Dkt. No. 189, at 29; *see id.*, at 28–30.) Plaintiff also argues that "it is clear from the specification that 'facility' is used to refer to a software program or portion thereof." (*Id.*, at 30.)

Defendants respond that "Defendants are proposing two constructions because that is precisely what is demanded by the express claim language." (Dkt. No. 193, at 28.) Defendants also respond that "with respect to dependent claims 9 and 70, Defendants' propose 'no *additional* construction' because these claims do not recite functions in addition to their respective independent claims. The construction for the independent claims therefore governs dependent claims 9 and 10 (as well as all claims depending on claims 1 and 61)." (*Id.*, at 29.) Defendants argue that "[t]he term 'model repository facility' does not have a generally understood structural meaning in the art" and is therefore a means-plus-function term limited to the corresponding structure disclosed in the specification. (*Id.*; *see id.*, at 29–30.)

Plaintiff replies that "[t]he only argument that 'model repository facility' has different meanings is that it is (sometimes) a § 112 ¶6 term, with different functions (and structures) in different claims; because Defendants have failed to meet their burden on this point, their proffered divergent constructions must be rejected." (Dkt. No. 194, at 10.)

<u>(2) Analysis</u>

Legal principles regarding 35 U.S.C. § 112, ¶ 6 are set forth above as to the term "the graph generator module."

Claims 1, 9, and 27 of the '458 Patent, for example, recite (emphasis added):

1. A model repository system, comprising:
    a data store for storing a plurality of data records;
    a data mining application for analyzing the data records and for generating a plurality of data models; and
    a model repository for storing the generated data models, wherein the model repository includes one or more index structures containing a plurality of attributes associated with the data models;
    wherein the data models are predictive data models;
    wherein the predictive data models are the entities being indexed by the one or more index structures such that the attributes of the predictive data models are stored within the one or more indexes;
    a *model repository facility* for exporting the generated data models to the model repository;
    at least three configuration files stored in the model repository, wherein a first configuration file stores information that is used by the *model repository facility* in exporting the generated data models to the model repository, and second and third configuration files store information that is used by the model repository system in building the main index in the model repository from attributes supplied by human end users and from the data mining application.

* * *

9. The model repository system of claim 1, wherein the *model repository facility* is integrated into the data mining application.

* * *

27. The model repository system of claim 1, wherein the *model repository facility* builds the index structures stored in the model repository after one or more selected models have been exported to the model repository.

Several limitations in Claim 1 refer to a structure "for" performing particular functions. Functional language does not necessarily invoke 35 U.S.C. § 112, ¶ 6. *See, e.g., Zeroclick*, 891 F.3d at 1008 ("the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions"). Instead, in the

absence of the word "means," a presumption arises that the claim language is *not* governed by

35 U.S.C. § 112, ¶ 6. *See Williamson*, 792 F.3d at 1348.

Defendants argue that "[t]he specification, however, is irrelevant to the threshold inquiry

of § 112[, ¶ 6]." (Dkt. No. 193, at 29.) On the contrary, the Federal Circuit has explained:

> [T]he first step in the means-plus-function analysis requires us to determine whether the entire claim limitation at issue connotes "sufficiently definite structure" to a person of ordinary skill in the art. In so doing, we naturally look to the *specification*, prosecution history, and relevant external evidence to construe the limitation. While this inquiry may be similar to looking for corresponding structure in the specification, our precedent requires it when deciding whether a claim limitation lacking means connotes sufficiently definite structure to a person of ordinary skill in the art.

*Apple*, 757 F.3d at 1296–97 (emphasis added).

The specification demonstrates that a "model repository facility" is a software structure

because the model repository facility "is preferably integrated into the data mining application."

'458 Patent at 2:47–48; *see id.* at 3:62–4:3; *see also id.* at 10:22–62 (regarding "MRF [(model

repository facility)] 18a"). This is also apparent in above-reproduced dependent Claim 9.

Statements by the patent examiner during prosecution, cited by Plaintiff, further reinforce this

understanding by referring to a "model repository facility" as potentially being integrated into a

data mining application. (*See* Dkt. No. 189, at 30 (citing Ex. H).) The deposition testimony of

Plaintiff's expert, cited by Defendants, does not compel otherwise. (*See* Dkt. No. 193, Ex. A, Nov.

19, 2019 Rosenblatt dep. at 95:12–15.) Finally on this issue, Defendants' expert opines, in full, as

follows:

> 87. The term "model repository facility" does not have a generally understood structural meaning in the art, and a person of ordinary skill in the art would have understood the term "model repository facility" as recited in the claims to be a nonstructural term associated with function [*sic*] of exporting generated data models to the model repository.

(Dkt. No. 193, Ex. B, Nov. 13, 2019 Jones Decl. at ¶ 87.) In light of the intrinsic evidence cited above, the opinion of Defendants' expert is unpersuasive.

The Court therefore hereby expressly rejects Defendants' proposal that 35 U.S.C. § 112, ¶ 6 applies. Defendants do not present any alternative proposal in the event that the Court finds that 35 U.S.C. § 112, ¶ 6 does not apply. No further construction is required. *See O2 Micro*, 521 F.3d at 1362; *see also Finjan*, 626 F.3d at 1207; *ActiveVideo*, 694 F.3d at 1326; *Summit 6*, 802 F.3d at 1291.

The Court accordingly hereby construes **"model repository facility"** to have its **plain meaning**.

## VIII. CONCLUSION

The Court adopts the construction set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 5th day of February, 2020.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE