**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| SAS INSTITUTE INC.,<br><br>                Plaintiff,<br><br>- vs -<br><br>WORLD PROGRAMMING LTD., et al.,<br><br>                Defendants. | CASE NO. 2:18-cv-00295-JRG |

**BRIEF OF ORACLE CORPORATION AS AMICUS CURIAE
<u>IN SUPPORT OF PLAINTIFF SAS INSTITUTE INC.</u>**

Anna G. Rotman, P.C. (TX Bar No. 24046761)
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone:  713 836 3600
Facsimile:   713 836 3601
Email:         anna.rotman@kirkland.com

*and*

Dale M. Cendali (*pro hac vice* pending)
Joshua L. Simmons (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
United States
Telephone:  212 446 4800
Facsimile:   212 446 4900
Email:         dale.cendali@kirkland.com
                  joshua.simmons@kirkland.com

Attorneys for Amicus Curiae
ORACLE CORPORATION

## **TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE .................................................................................................. 1

PRELIMINARY STATEMENT ....................................................................................................... 2

ARGUMENT ....................................................................................................................................... 3

    I.    COMPUTER PROGRAMS ARE ENTITLED TO THE SAME BROAD COPYRIGHT PROTECTION AS OTHER WORKS ............................................ 3

    II.   THE ABSTRACTION-FILTRATION-COMPARISON ANALYSIS SHOULD BE APPLIED WITH AN EYE TOWARD THE OPTIONS THAT WERE AVAILABLE TO THE COPYRIGHT OWNER .......................... 7

    III.  BROAD COPYRIGHT PROTECTION IS IMPORTANT TO THE SOFTWARE INDUSTRY ............................................................................................ 11

CONCLUSION ................................................................................................................................ 12

CERTIFICATE OF SERVICE ....................................................................................................... 13


# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple Computer, Inc. v. Formula Int'l, Inc.*,
    725 F.2d 521 (9th Cir. 1984) ..................................................................................................9

*Atari Games Corp. v. Nintendo of Am., Inc.*,
    975 F.2d 832 (Fed. Cir. 1992)..............................................................................................4, 9

*Atari Games Corp. v. Oman*,
    979 F.2d 242 (D.C. Cir. 1992) ................................................................................................6

*Boisson v. Banian, Ltd*,
    273 F.3d 262 (2d Cir. 2001)................................................................................................7, 8

*Castle Rock Entm't v. Carol Publ'g Grp.*,
    150 F.3d 132 (2d Cir. 1998)....................................................................................................5

*CDN Inc. v. Kapes*,
    197 F.3d 1256 (9th Cir. 1999) ................................................................................................4

*Compaq Computer Corp. v. Procom Tech., Inc.*,
    908 F. Supp. 1409 (S.D. Tex. 1995) .......................................................................................6

*Compulife Software Inc. v. Newman*,
    959 F.3d 1288 (11th Cir. 2020) ..............................................................................................8

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*,
    26 F.3d 1335 (5th Cir. 1994), 46 F.3d 408 (5th Cir. 1995) .................................................5, 7

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991).......................................................................................................*passim*

*Gates Rubber Co. v. Bando Chemical Indus., Ltd.*,
    9 F.3d 823 (10th Cir. 1993) .........................................................................................8, 9, 10

*Golan v. Holder*,
    132 S. Ct. 873 (2012)..............................................................................................................5

*Hutchins v. Zoll Med. Corp.*,
    492 F.3d 1377 (Fed. Cir. 2007)............................................................................................10

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters.*,
    945 F.2d 509 (2d Cir. 1991)....................................................................................................4

*Kregos v. Associated Press*,
   937 F.2d 700 (2d Cir. 1991)...................................................................................................4

*Oracle Am., Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014).........................................................................................6, 8

*Oriental Art Printing, Inc. v. Goldstar Printing Corp.*,
   175 F. Supp. 2d 542 (S.D.N.Y. 2001)...................................................................................4

*Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*,
   274 F.2d 487 (2d Cir. 1960)...................................................................................................7

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987)...................................................................................................10

*Skidmore v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) ...............................................................................................7

*Sparaco v. Lawler, Matusky & Skelly Eng'rs LLP*,
   303 F.3d 460 (2d Cir. 2002)...................................................................................................9

*Syrus v. Bennett*,
   455 F. App'x 806 (10th Cir. 2011) .......................................................................................10

*Tetris Holding, LLC v. Xio Interactive, Inc.*,
   863 F. Supp. 2d 394 (D.N.J. 2012) ........................................................................................5

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993).................................................................................................5

*Wainwright Secs. Inc. v. Wall St. Transcript Corp.*,
   558 F.2d 91 (2d Cir. 1977).....................................................................................................5

*Warner Bros. Entm't Inc. v. RDR Books*,
   575 F. Supp. 2d 513 (S.D.N.Y. 2008)....................................................................................5

*Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*,
   797 F.2d 1222 (3d Cir. 1986).................................................................................................8

**Statutes**

37 C.F.R. § 202.1(a)......................................................................................................................10

17 U.S.C. § 101...............................................................................................................................4

17 U.S.C. § 102(a) ..........................................................................................................................3

17 U.S.C. § 102(b) ..........................................................................................................................5

17 U.S.C. § 302 ............................................................................................................................9

17 U.S.C. § 410(a) .......................................................................................................................9

Pub. L. No. 93-573, § 201, 88 Stat. 1873, 1873 (1974) ...............................................................4

**Legislative Material**

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 54 ..............................................................................4

**Rules**

Fed. R. App. P. 29 .........................................................................................................................2

**Other Authorities**

*The Economic Impact of Software*, BSA: THE SOFTWARE ALLIANCE,
   https://softwareimpact.bsa.org/;
   https://softwareimpact.bsa.org/pdf/states/Texas_Software_Economic_Impact_
   Study_2pg.pdf ........................................................................................................................11

Testimony of Robert W. Holleyman II, BSA President and CEO, Made in
   America: Increasing Jobs Through Exports and Trade: Hearing before the
   Subcommittee on Commerce, Manufacturing and Trade of the House
   Committee on Energy and Commerce, at 2 (Mar. 16, 2011) .................................................11

**INTERESTS OF AMICUS CURIAE**

Non-Party Oracle Corporation ("Oracle") is one of the world's largest and leading technology companies, providing complete, open, and integrated business software and hardware systems. Its products and services include applications and infrastructure offerings that are delivered worldwide through a variety of flexible and interoperable IT deployment models. In particular, Oracle is chosen by its customers—which include business of many sizes, government agencies, educational institutes, and resellers—for its innovate software, as well as its commitment to investment in and innovation with respect to that software. Indeed, in each of the last three years, Oracle invested over $6 billion in research and development to enhance its existing portfolio of offerings and to develop new technologies and services.

Oracle has a significant interest in the outcome of this dispute as the decisions that the Court makes may affect all software companies, including Oracle, who depend on robust copyright protection for their works to support their businesses and their substantial investments in the creation of new software. Software companies routinely protect their investments in their software based on their copyrights, and such copyrights form the backbone of their licensing models. Thus, although patent law remains an important component of modern software companies' intellectual property portfolios, copyright law provides the most reliable and effective protection against unauthorized copying. Indeed, the vital role of copyright protection in the software space has been magnified in recent years, as developments in patent law, including subject matter eligibility, have cast doubt on the scope and availability of patent protection. Oracle is concerned that Defendant World Programming Ltd. ("WPL") intends to encourage a narrow scope of copyright protection for software, which is inconsistent with the standard application of copyrightability principles and

the abstraction-filtration-comparison test.  Thus, Oracle files this brief in support of Plaintiff SAS Institute Inc. ("SAS").[1]

## PRELIMINARY STATEMENT

Since at least 1976, it has been clear that copyright protection applies to computer programs and extends to all of their elements.  Although the courts have taken different approaches, one thing has remained constant: the same rules that apply to other creative works, apply to computer programs.  As a result, creative programs are afforded protection against copying.

To determine whether copyright protection exists, courts across this country apply a consistent rubric.  First, the copyright owner establishes that it holds a copyright in the allegedly infringed computer program by showing that the program was independently created and possesses a modicum of creativity.  Creativity in this context can mean many things, including the intellectual labor of creating a computer program that is easy to use, concise, and intuitive.  When there are multiple versions of the program, all of the versions are treated as one work.  Courts do not attempt to address each work separately as doing so would be unwieldy for courts and litigants.

Second, the copyright owner establishes that the defendant copied original elements from the work.  To the extent that the alleged infringer seeks to argue that those elements are unprotectable, the alleged infringer must come forward with such evidence, which is analyzed consistent with the traditional doctrines of merger, scènes à faire, and the words and short phrases doctrine.  Of critical importance to that inquiry, however, is that protectability is determined at the point that the work was created, as opposed to an ever changing subsequent point in time.  This is

---

[1] Consistent with Federal Rule of Appellate Procedure 29, no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than Oracle and its counsel—contributed money that was intended to fund preparing or submitting this brief

because a work is copyrightable from the moment it is created, and remains protected until its copyright expires. To approach protectability otherwise would be difficult for the Copyright Office to administer as it must determine copyrightability once, when the work is registered. It simply would not make sense to allow protection to change based on subsequent circumstances—e.g., if a work gains popularity or widespread use in a particular market. Moreover, where there are alternative options available to the copyright owner in creating the copied elements, the foregoing limiting doctrines do not apply.

Oracle files this brief in support of SAS because the consistent application of these fundamental copyright law principles is critical to the well-functioning software economy. Indeed, software developers rely on the protection of their works to ensure that their creativity is rewarded and that copyists cannot swoop in and take original creators' works for themselves. The issues are no different for the book writer, photographer, or musician. Thus, Oracle respectfully requests that, as this Court approaches its upcoming hearing on the copyright protection of SAS's SAS System, it stays true to the traditional application of these doctrines, safeguarding for both SAS and the software industry a reliable copyright law system.

## ARGUMENT

### I. COMPUTER PROGRAMS ARE ENTITLED TO THE SAME BROAD COPYRIGHT PROTECTION AS OTHER WORKS

Under the Copyright Act, computer programs generally are afforded the same protections as any other work. "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression," including "literary works." 17 U.S.C. § 102(a). As used in the Copyright Act, the term "original" merely means that the work was "independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). "The vast

majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* at 345 (quotation marks omitted; emphasis added). As a result, courts routinely have found works less creative than computer programs to be copyrightable, including a Chinese yellow pages, *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters.*, 945 F.2d 509, 514 (2d Cir. 1991); estimates of coin values, *CDN Inc. v. Kapes*, 197 F.3d 1256, 1257-58, 1260-61 (9th Cir. 1999); pitcher's statistics, *Kregos v. Associated Press*, 937 F.2d 700, 702, 704 (2d Cir. 1991); and even a Chinese menu, *Oriental Art Printing, Inc. v. Goldstar Printing Corp.*, 175 F. Supp. 2d 542, 548 (S.D.N.Y. 2001).

When Congress passed the modern Copyright Act in 1976, it did so with the intent that the term "literary works" would include "computer programs to the extent that they incorporate authorship in the programmer's expression of original ideas." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 54; *see also Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 838 (Fed. Cir. 1992) ("As literary works, copyright protection extends to computer programs."). As part of Congress's revision of U.S. copyright law, however, it understood that additional study of computer programs would be useful to determining how best to protect them. Thus, it established the National Commission on New Technological Uses of Copyright Works ("CONTU") to study computer programs and how they interact with copyright law. Pub. L. No. 93-573, § 201, 88 Stat. 1873, 1873 (1974). CONTU issued its final report on July 31, 1978, concluding that Congress should "make it explicit that computer programs, to the extent that they embody an author's original creation, are proper subject matter of copyright." Final Rpt., at 1.

As a result of the CONTU Report, Congress added to the Copyright Act a definition of the term "computer program": "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. This definition reflects the

traditional idea/expression dichotomy that is applied to all works, and which is now codified at 17 U.S.C. § 102(b).  *Golan v. Holder*, 132 S. Ct. 873, 890 (2012).  Specifically, the aspects of the computer program that are expressive are copyrightable, whereas the functions that the computer program performs (the "certain result" that it brings about in the computer) is not.

By providing a definition for computer programs, Congress also made explicit that computer programs are to be treated the same as other literary works.  Thus, copyrightability for a computer program is determined based on the same low originality standard as any other work. *Feist*, 499 U.S. at 345.  Further, that protection "extends not only to the literal elements of a program, *i.e.*, its source code and object code, but also to its 'nonliteral' elements, such as the program architecture, 'structure, sequence and organization', operational modules, and computer-user interface."  *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir. 1994), *opinion supplemented on denial of reh'g*, 46 F.3d 408 (5th Cir. 1995).  The Fifth Circuit also has held that copyright protection extends to "input formats and output reports."  *Id.* at 1347.

Moreover, like other works, when there are multiple versions of a computer program, it makes sense for the Court to treat them collectively, rather than parsing them to map from each of plaintiff's works to each of the defendant's works.  *See Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 138 (2d Cir. 1998) (treating 82 separate episodes of *Seinfeld* television series "as a single work"); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372–73, 1381 (2d Cir. 1993) (comparing infringing book to eight episodes of *Twin Peaks* that were treated as a whole); *Wainwright Secs. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977) (addressing abstracts of research reports cumulatively); *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 396 (D.N.J. 2012) (discussing different versions of *Tetris* electronic game in the aggregate as "Tetris"); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513,

535 (S.D.N.Y. 2008) (discussing infringement of seven *Harry Potter* novels and two companion books in the aggregate).

Given these precedents, to the extent that the SAS System was created by SAS and has more than a modicum of creativity, Dkt. 444, at 13–17, it is protectable.  Indeed, SAS's opening brief extensively discusses the creation of the SAS System, including the numerous choices that its engineers needed to make to reach the product that SAS offers to the market.  Creative choices are the essence of protectability.  *See Feist*, 499 U.S. at 345 (creative choices as to selection and arrangement are protectable); *Atari Games Corp. v. Oman*, 979 F.2d 242, 245 (D.C. Cir. 1992) (creative ordering of elements is protectable); *Compaq Computer Corp. v. Procom Tech., Inc.*, 908 F. Supp. 1409, 1418 (S.D. Tex. 1995) (copyright owner's choices "reflect the requisite degree of creativity and judgment necessary to protect its compilation").

SAS also analogized to Oracle's Java packages, which were designed using a "creative process."  *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1356 (Fed. Cir. 2014).  "Sun/Oracle developers had a vast range of options for the structure and organization" of the packages, *id.*, and by making numerous choices,[2] they created a unique selection and arrangement that would be easy to use and attractive to programmers.  *Id.* at 1361 n.6, 1363, 1365.  Often choices that lead to concise, memorable code require the most creativity.  In Oracle's case, its expressive choices in selecting and arranging its declaring code and the structure, sequence, and organization of its API packages was held to be copyrightable.  *Id.* at 1365, 1368.

---

[2] Among Oracle's many design choices were: how should classes be organized under other classes, how should interfaces be organized under other interfaces, how should classes and interfaces relate, where should the methods be, what should the methods be named, what kinds of inputs do the methods take, what kind of outputs do the methods provide for the fields, how do they relate, is the value in a field a color, or is it just a number, or is it a string, or is it something else?

## II. THE ABSTRACTION-FILTRATION-COMPARISON ANALYSIS SHOULD BE APPLIED WITH AN EYE TOWARD THE OPTIONS THAT WERE AVAILABLE TO THE COPYRIGHT OWNER

As with copyrightability, the determination of infringement for computer programs is similar to that applied to other works. For all works, "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. There are two components to the second element. "First is the factual question whether the alleged infringer actually used the copyrighted material to create his own work." *Eng'g Dynamics*, 26 F.3d at 1340. There appears to be no dispute as to WPL's copying. Dkt. 444, at 17–21.

The second question is "whether the copying is legally actionable," which requires "a court to determine whether there is substantial similarity between the two works." *Eng'g Dynamics*, 26 F.3d at 1341. Different courts have determined substantial similarity using different tests. *See, e.g., Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (applying "extrinsic/intrinsic test," which first "compares the objective similarities of specific expressive elements in the two works" and then "tests" for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance" (alterations omitted)); *Boisson v. Banian, Ltd*, 273 F.3d 262, 272 (2d Cir. 2001) (applying "more discerning observer test," which asks whether there is "substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation"); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (applying "ordinary observer test," which asks whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same").

The Fifth Circuit has "endors[ed] the abstraction-filtration-comparison method of determining copyright protection for computer programs." *Eng'g Dynamics*, 26 F.3d at 1343

(citing *Gates Rubber Co. v. Bando Chemical Indus., Ltd.*, 9 F.3d 823, 1342 (10th Cir. 1993)). The Abstraction-Filtration-Comparison ("AFC") test, however, is just another way of approaching the underlying question of whether the alleged infringer copied original elements from the copyright owner's works. Thus, as with other approaches to substantial similarity, the copyright owner has the burden of demonstrating "that the defendant engaged in factual copying," and the ultimate burden on substantial similarity. *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301, 1305 (11th Cir. 2020). The Eleventh Circuit, however, recently considered the burden of proving whether the elements of the copyrighted work that the alleged infringer copied were protectable or unprotectable, and it concluded that "the *defendant* bears the burden of proving—as part of the filtration analysis—that the elements he copied from a copyrighted work are unprotectable." *Id.* at 1305 (emphasis in original); *see also Boisson*, 273 F.3d at 269 (holding that defendants "bear the burden of proving that [any particular element] is not original").

Thus, here, SAS must come forward with its evidence of copying. Dkt. 444, at 11–13, 1721. At that point, WPL must explain why the elements that it copied from SAS are unprotectable and should be filtered out of the AFC enquiry, which SAS may dispute. And finally, the protectable elements are compared to WPL's work to determine "whether those protectable portions of the original work that have been copied constitute a substantial part of the original work—*i.e.* matter that is significant in the plaintiff's program." *Gates Rubber*, 9 F.3d at 839. This final step "is primarily a qualitative rather than a purely quantitative analysis . . . and must be performed on a case-by-case basis." *Id.* (citing *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1245 (3d Cir. 1986)).

In considering the filtration of copied elements, it is important to remember that protectability must be "evaluated at the time of creation, not at the time of infringement." *Oracle*,

750 F.3d at 1361 (citing *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 524 (9th Cir. 1984)). As the Copyright Act makes clear, "[c]opyright in a work . . . subsists from its creation" until the duration of its copyright ends. 17 U.S.C. § 302. This is particularly true with regard to computer programs, which CONTU recognized would be protected "from the moment of their fixation in any tangible medium of expression." CONTU Rpt., at 21. If copyrightability could change over time, with elements becoming unprotectable based on events after the work was created, it would be in inconsistent with the Copyright Act. Moreover, a shifting concept of copyright protection would not be administrable by the Copyright Office, which examines copyright applications to determine whether "the material deposited constitutes copyrightable subject matter" before issuing a certificate of registration. 17 U.S.C. § 410(a). The Copyright Act does not contain a procedure for the Copyright Office to reevaluate such certificates based on perceived changes in protectability over time.

As to the individual filtration arguments at issue here, the **merger** doctrine is an extension of the idea/expression dichotomy mentioned earlier. The Copyright Act grants no protection for "the author's generalized ideas and concepts," only for the author's expression (*i.e.*, the "more precisely detailed realization of those ideas"). *Sparaco v. Lawler, Matusky & Skelly Eng'rs LLP*, 303 F.3d 460, 468 (2d Cir. 2002). "Under the merger doctrine, copyright protection is denied to expression that is inseparable from or merged with the ideas, processes, or discoveries underlying the expression." *Gates Rubber*, 9 F.3d at 838. If, however, "alternative expressions are available," merger does not apply. *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 840 (Fed. Cir. 1992). Thus, to the extent that WPL identifies elements that it argues are unprotectable pursuant to the merger doctrine, it must show that alternate expressions were not available to SAS at the time SAS created the copyrighted work. If they were, Dkt. 444, at 25, merger does not apply.

*Scènes à faire* is a similar concept, which "den[ies] protection to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting." *Gates Rubber*, 9 F.3d at 838. In the context of computer programs, this means elements that, when they were created, were "dictated by external factors," such as "hardware standards and mechanical specifications . . . software standards and compatibility requirements . . . computer manufacturer design standards, target industry practices and demands . . . and computer industry programming practices." *Id.* As SAS indicates that "there is no evidence here that anything asserted by SAS falls into those categories," Dkt. 444, at 25, *scènes à faire* does not apply.

Another concept is the "**words and short phrases**" doctrine. This concept is based on the Copyright Office's regulation that indicates that "works not subject to copyright" include "[w]ords and short phrases such as names, titles, and slogans." 37 C.F.R. § 202.1(a). The short phrases doctrine, however, does not mean that every short phrase is not protectable. If that were true, copyists would be free to reproduce every book because they are a combination of words and short phrases. Instead, although "[c]opyright protection does not protect individual words and 'fragmentary' phrases when removed from their form of presentation and compilation," short phrases are "subject to copyright in the form in which [they are] presented." *Hutchins v. Zoll Med. Corp.*, 492 F.3d 1377, 1385 (Fed. Cir. 2007); *accord Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987). Thus, "a short phrase may command copyright protection if it exhibits sufficient creativity." *Syrus v. Bennett*, 455 F. App'x 806, 809 (10th Cir. 2011) (quoting 1-2 Nimmer on Copyright § 2.01[B] at 2-17). To the extent that the elements WPL copied from SAS are short but part of a larger combination and creative, Dkt. 444, at 26–27, they are protectable.

## III. BROAD COPYRIGHT PROTECTION IS IMPORTANT TO THE SOFTWARE INDUSTRY

When the foregoing principles are applied appropriately, it reveals that computer programs are entitled to copyright protection in the same manner as any other work. As a result of Congress's decision to protect computer programs in this way, the software industry has seen incredible growth since 1976. As of 2014, software had added $475.3 billion to the GDP of the United States, and $30 billion to the State of Texas. *See The Economic Impact of Software*, BSA: THE SOFTWARE ALLIANCE, https://softwareimpact.bsa.org/; https://softwareimpact.bsa.org/pdf/states/Texas_Software_Economic_Impact_Study_2pg.pdf. Moreover, software companies employ approximately 2,500,000 U.S. workers, almost 10% of which are based in Texas. *See id.*; Testimony of Robert W. Holleyman II, BSA President and CEO, Made in America: Increasing Jobs Through Exports and Trade: Hearing before the Subcommittee on Commerce, Manufacturing and Trade of the House Committee on Energy and Commerce, at 2 (Mar. 16, 2011).

As the Framers intended, this growth is caused by constant innovation as individuals, companies, and public institutions invest their creative talents, time, and money in developing new software year over year. It will not continue, however, if free-riders are permitted to copy from true innovators instead of creating their own works. Copyright law ensures this creativity is rewarded and theft is punished. If software developers cannot receive protection for the works that they create, or if copyright law is not applied consistently with the foregoing principles, the incentives to create will be reduced or destroyed, depriving the public and the economy of the benefits of a vibrant software industry.

## **CONCLUSION**

For the foregoing reasons, Oracle respectfully requests that the Court consider the broader implications of this case, and apply the standard principles of copyright law to reward SAS's creativity.

Dated: September 14, 2020

                                                */s/ Anna G. Rotman*
Anna G. Rotman, P.C. (TX Bar No. 24046761)
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: 713 836 3600
Facsimile: 713 836 3601
Email: anna.rotman@kirkland.com

and

Dale M. Cendali (*pro hac vice* pending)
Joshua L. Simmons (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
United States
Telephone: 212 446 4800
Facsimile: 212 446 4900
Email: dale.cendali@kirkland.com
             joshua.simmons@kirkland.com

Attorneys for Amicus Curiae
ORACLE CORPORATION

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically via the Court's EM/ECF on September 14, 2020.  As a result, this document was served on all counsel who are deemed to have consented to electronic service.

<div style="text-align: right">

*/s/ Anna G. Rotman*
Anna G. Rotman

</div>