REDACTED AND PUBLICLY FILED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| SAS INSTITUTE INC.,<br><br>Plaintiff,<br><br>vs.<br><br>WORLD PROGRAMMING LIMITED,<br><br>Defendant. | Case 2:18-cv-00295-JRG |

### REPLY BRIEF IN SUPPORT OF PLAINTIFF'S POSITION FOR COPYRIGHTABILITY HEARING

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

I.   WPL FAILS TO SHOW IT COPIED ONLY UNPROTECTABLE ELEMENTS ............. 1

II.  SAS'S OUTPUT DESIGNS ARE COPYRIGHTABLE AND PROTECTED ................... 3

III. SAS'S INPUT FORMATS ARE COPYRIGHTABLE AND PROTECTED ...................... 5

IV.  WPL ERRONEOUSLY CLAIMS THAT SAS "DID NOT FILTER"; WPL DISAGREES WITH PROFESSOR STORER'S FILTERING APPROACH, AND DOES NOT ITSELF CONDUCT THE FILTRATION IT INSISTS IS NECESSARY ..... 8

CERTIFICATE OF SERVICE

CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

## TABLE OF AUTHORITIES

**Cases**

*Cisco Sys. Inc v. Arista Networks, Inc.*,
   No. 14-cv-05344 (N.D. Cal. Dec. 9, 2016) ............................................................................ 9, 10

*Boisson v. Banian, Ltd*,
   273 F.3d 262 (2d Cir. 2001) ......................................................................................................... 2

*Compaq Computer Corp. v. Ergonome, Inc.*,
   137 F. Supp. 2d 768 (S.D. Tex. 2001) ........................................................................................ 9

*Compulife Software Inc. v. Newman*,
   959 F.3d 1288 (11th Cir. 2020) ........................................................................................ 1, 2, 10

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992) ...................................................................................................... 2, 6

*Engineering Dynamics, Inc. v. Structural Software, Inc.*,
   26 F.3d 1335 (5th Cir. 1994) ........................................................................................................ 7

*General Universal Systems, Inc. v. Lee*,
   379 F.3d 131 (5th Cir. 2004) ........................................................................................................ 2

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
   12 F.3d 527 (5th Cir. 1994) .......................................................................................................... 6

*Macro Niche Software, Inc. v. 4 Imaging Sols., LLC*,
   No. 12-cv-2293, 2013 WL 12140417 (S.D. Tex. Dec. 18, 2013) ........................................... 8, 9

*Oracle America, Inv. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) ............................................................................................ *passim*

*SAS Inst. Inc. v. World Programming Ltd.*,
   874 F.3d 370 (4th Cir. 2017) ........................................................................................................ 3

**Statutes**

17 U.S.C. § 101 .................................................................................................................................. 8

17 U.S.C. § 102(a) ............................................................................................................................. 3

**Other Authorities**

4 Nimmer on Copyright § 13.03[F][3] (2019) ................................................................................. 1

United States Copyright Office, Compendium III: Copyright Office Practices,
   2014 WL 7749582 (3d ed. Rev. Public Draft Mar. 15, 2019) .................................................. 3

The purpose of the October 14 hearing is for the Court to determine "the *core protectable expression*" in the SAS System so it may instruct the jury on that issue and thereby "facilitate an accurate 'comparison' as part of the infringement analysis." (ECF No. 436, at 1.) SAS has offered an abstraction and filtration analysis that does exactly that, identifying the collections of SAS input formats and output designs as that protectable core. In response, WPL adopts a go-for-broke approach – critiquing SAS's filtering analysis but failing to perform the analysis it claims must be done. The reason for WPL's strategy is clear: its business depends not on copying *some* – potentially unprotected – elements of SAS's software, but on copying the whole. (SAS Opening Br. at 17-21, ECF No. 441.) Therefore, if there is *any core protectable expression* in the non-literal elements of SAS's software, an infringement finding is inescapable. But WPL cannot allege SAS's filtration analysis is somehow insufficient without offering its own. If there is "merger" information that should have been filtered, WPL has not presented evidence of specific expressions that merged with underlying ideas. If there is scène à faire material that should have been filtered, where is the evidence of specific expressions subject to preexisting industry standards? WPL offers nothing yet expects the Court to find nothing protectable. (WPL Resp. Br. at 27-29, ECF No. 451.) And even if WPL had undertaken this analysis, it would have no answer to the rule that copyright protects creative selection and arrangement of uncopyrightable elements.

## I. WPL FAILS TO SHOW IT COPIED ONLY UNPROTECTABLE ELEMENTS

In its Opening Brief, SAS explained (at 21–22) that "the *defendant* bears the burden of proving – as part of the filtration analysis – that the elements he copied from a copyrighted work are *unprotectable*." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1305 (11th Cir. 2020). This burden allocation "enjoys the support of the foremost copyright treatise," *id.* (citing 4 Nimmer on Copyright § 13.03[F][3] (2019)), and it is "fairer and more efficient," *id.* at 1306. In response, WPL dismisses the Eleventh Circuit's holding and analysis as mere "policy preferences" that "do

not outweigh controlling Fifth Circuit authority." (WPL Resp. Br. at 9.) But there is no such contrary authority. WPL relies on *General Universal Systems, Inc. v. Lee*, 379 F.3d 131 (5th Cir. 2004) (per curiam), where the plaintiff claimed at oral argument that "the burden should have been placed on [the defendant] to prove that the material taken was unprotectable," *id*. at 143 n.26. The Fifth Circuit did "not consider" that argument, but it went on to cite the approach taken by the Eleventh Circuit, which has since held in *Compulife* that the defendant has that burden. *Id*.[1]

WPL's failure to present evidence or argument about any particular non-literal aspect of SAS's software is all the more acute here because, regardless of burden, SAS *has* performed the filtration analysis. It eliminated any claim that WPL copied the main purpose of the SAS System or the mechanisms by which users formulate and provide input and receive output. *Cf. Compulife*, 959 F.3d at 1306 n.8 ("A plaintiff may concede that some element of code is unprotectable, in which case a district court will not err in filtering that element."). And SAS identified the "core of protectable expression" that WPL copied: the collection of input formats and output designs, and the naming and syntax of PROCs, statements, options, formats, informats, global statements, access engines and other elements. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992). SAS thus "define[d] its protectable expression" (WPL Resp. Br. at 10), and the burden is on WPL to explain why that expressive core is unprotectable. As shown below, WPL fails to carry that burden. That failure confirms that a jury must decide whether WPL copied SAS's input formats and output designs.

---

[1] WPL likewise misses the mark when it argues that the *Compulife* court "expressly did not apply the *Altai* test and confined its opinion to 'literal' copyright." (WPL Resp. Br. at 10.) The Eleventh Circuit "focus[ed] on the filtration step" of the A-F-C test after rejecting the notion that the *Altai* reasoning is limited to nonliteral copying. *Compulife*, 959 F.3d at 1304. If WPL believes it had a right to copy non-literal aspects of SAS's software because those aspects are unprotectable for one reason or another, it has to explain why. *See Boisson v. Banian, Ltd*, 273 F.3d 262, 269 (2d Cir. 2001) (defendants "bear the burden of proving that this particular layout is not original").

2

## II. SAS'S OUTPUT DESIGNS ARE COPYRIGHTABLE AND PROTECTED

SAS's Opening Brief described (at 11) how Professor Storer identified the SAS System's collection of output designs as the fourth element of his levels of abstraction. Those output designs were defined as including "the order, types of statistical and graphical output, and other identification of output, including output designs resulting from default parameters." (*Id*. (quoting Storer Rep. at 28).) The Brief discussed Professor Storer's filtration analysis in which he detailed the creative and expressive aspects of those output designs. (Storer Rep. at 36-39, 45-51; Storer Decl. ¶¶ 24-30.) The Brief described how the SAS System allows users to generate "the designed output with concise written instructions that would otherwise require literally hundreds of thousands of lines of code in a low-level programming language." (SAS Opening Br. at 16 (quoting Collins Decl. ¶ 6).)[2] And the Brief referenced WPL's marketing material, which stated WPS "[p]roduces equivalent data output" to the SAS System (*id*. at 18), and hundreds of examples of near-identical output designs from SAS and WPS (and the markedly different output designs from other statistical software systems). (*See* Storer Decl. Exs. D, E & F.)

So crucial was the copying of SAS's output designs to WPS that one WPL employee testified, "[a]ll users of the SAS software expect WPS to give *precisely the same output* as is produced by the SAS software in response to any given input." (SAS Opening Br. at 20.) Indeed, WPL took great pains to replicate those SAS output designs. *SAS v. WPL*, 874 F.3d 370, 376 (4th Cir. 2017) ("Developers at WPL ran SAS programs through both the [SAS] Learning Edition and

---

[2] WPL's contention that the "'output designs' do not reflect the … contents" of the SAS System, but are generated by third parties, and thus fail the fixation requirement of 17 U.S.C. § 102(a) (WPL Resp. Br. at 22), ignores Collins's testimony and is patently wrong. *See* United States Copyright Office, Compendium III: Copyright Office Practices, 2014 WL 7749582, at *43 (3d ed. Rev. Public Draft Mar. 15, 2019) ("[A] computer program and the screen displays generated by that program are considered the same work, because the program code contains fixed expression that produces the screen displays.").

3

WPS, and then modified WPS's code to make the two achieve more similar outputs."). In other words, WPL meticulously copied SAS's output designs because its customers demanded it.

WPL's brief pointedly ignores these facts and tries to divert attention from their significance with a strawman argument that is, at best, a matter for the jury: that SAS is asserting copyright not in the output designs contained within the SAS System but in given pieces of output "generated by third parties," *i.e.*, by users. (WPL Resp. Br. at 21.) But SAS is not asserting copyright protection over "mathematical and statistical variables and constants," the "idea" of "graphs, charts, tables, plots," or "user data, and calculated values," as WPL suggests. (*Id.* at 29.) SAS instead claims protection in the "output designs" that WPL took pains to copy exactly to allow WPS to produce "precisely the same output." (SAS Opening Br. at 20.) Indeed, WPL has repeatedly failed to grapple with the fact that the default output design, for example, from SAS's PROC UNIVARIATE is identical to the WPS output across *dozens* of design elements, none of which is dictated by an industry standard or the user's input (as demonstrated by significantly different output from software designed by SAS competitors). (*See* Storer Rep. at 47.)



And tellingly, WPL does not address a single graphical comparison of SAS and WPS output designs.

Instead, WPL relies on a few cherry-picked examples. Yet even those examples fail to support its contentions. In its Appendix D, WPL purports to compare current SAS System output for three SAS procedures to output from SAS 76. A cursory examination, however, reveals multiple dissimilarities, additions, and subtractions between the current output designs and that of

the 40-year-old version, reflecting numerous later creative design decisions by SAS to modify and change the output. If WPL could have made a marketable product by copying the SAS 76 output designs, it could have started with the SAS 76 output for these PROCS, then made its own creative decisions to develop its software rather than slavishly copying the output designs from the modern version of SAS as its customers demanded.

WPL does not contend that its argument concerning the "lion's share" of contribution to output (WPL Resp. Br. at 23-24) is a filtration issue, and none of its cited cases indicate that the issue implicates filtration. While the user provides input – *e.g.*, the decision to use a particular PROC, a title, or the basic data – that is reflected in the particular output, it is SAS that created the output *design* for each PROC. The output design remains SAS's regardless what numbers are plugged into it based on the user's data. At most, this is another issue on which a jury can be instructed as it undertakes its comparison of SAS and WPS output designs.

### III. SAS'S INPUT FORMATS ARE COPYRIGHTABLE AND PROTECTED

On inputs, WPL's brief (at 16-21) tries to sidestep the totality of its copying by accusing SAS of being "fuzzy" (*id.* at 16), and falling back on an inaccurate claim that "SAS has conceded that the SAS Language is free to use by the public without a license," (*id.* at 17).[3]

WPL, however, fails to address the real issue, which is embodied most clearly in the example provided in Figure 3 of SAS's Opening Brief (at 20). That figure is a single page from WPL's own "Quick Reference for Language Support Concerning Statistical Analysis" (*id.* at 19), which sets out nine statements in SAS's PROC ANOVA (all marked by WPL as "supported" in WPS), and 42 options, 35 of which are marked as "supported." That single page demonstrates WPL's copying of the overall structure, sequence, and organization of that specific SAS PROC

---

[3] SAS explained in earlier briefing why WPL's free-to-use contention is inaccurate. (*See* ECF No. 296, at 6-7 & Ex. C (ECF No. 296-4).)

5

and its syntax. WPL makes no effort, for example, to show that the option "DUNNETTU" was part of SAS 76, that option "SIDAK" within the overall syntax of PROC ANOVA and its MEANS statement is scène à faire by virtue of being a dictated industry standard, or that its name in that context somehow merges with the idea of SIDAK which could "be expressed in only one way." *Oracle America, Inv. v. Google Inc.*, 750 F.3d 1339, 1360 (Fed. Cir. 2014). Instead, WPL's own document shows that it meticulously replicated the structure and arrangement of SAS's PROC ANOVA, as created by SAS and expressed in the SAS System as a "unique arrangement of computer program expression." *Id.*

The balance of WPL's "Quick Reference" shows hundreds of additional examples.  That most of these elements are short phrases does not diminish their creativity within the overall collection of SAS System input formats. As the Federal Circuit put it in *Oracle*:

> By analogy, the opening of Charles Dickens' *A Tale of Two Cities* is nothing but a string of short phrases. Yet no one could contend that this portion of Dickens' work

---

[4] WPL, while giving lip-service to the well-established principle that non-literal elements of software are entitled to copyright protection (WPL Resp. Br. at 1), continually seeks to apply precedent concerning literal copying, *i.e.*, copying of source code. (*See id.* (referring to "some 'non-literal' aspect of the code").) In fact, since at least *Altai*, 982 F.2d at 702, courts have recognized the "powerful" syllogism: "if the non-literal structures of literary works are protected by copyright; and if computer programs are literary works, as we are told by the legislature; then the non-literal structures of computer programs are protected by copyright." Here the source code is beside the point: WPL's own Quick Reference Guide, intended to sell WPS to SAS users, lists the very same non-literal elements – *e.g.*, PROCs, statements, options – that SAS contends WPL copied. In other words, *WPL itself*, as a part of its marketing efforts, has identified the non-literal aspects of the SAS System it has copied. Such evidence can establish infringement. *See Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 534 (5th Cir. 1994) (rejecting defendant's claim of improper filtration by the district court and holding that "a damning similarity – nay identity – of organization and language" was "strong evidence for the court's finding that the [defendant's] MPO program infringed.").

is unworthy of copyright protection because it can be broken into those shorter constituent components. The question is not whether a short phrase or series of short phrases can be extracted from the work, *but whether the manner in which they are used or strung together exhibits creativity.*

750 F.3d at 1363 (emphasis added).

In the end, WPS was "built to emulate SAS" by requiring the exact same input formats as SAS in their organization and structure. (*See* SAS Opening Br. at 17-21.) How those input formats are used is at least as "quasi-textual" as the manner in which users were guided to perform the analyses described in *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1342 (5th Cir. 1994). That proposition, in turn, is demonstrated by the fact that, if a user inputted into the SAS System the expressions for a regression analysis from a competing statistical analysis software product like SPSS (*see* Storer Decl. ¶ 22), the SAS System (or WPS) would produce no results or an error. WPL, for that reason, had to copy the SAS input formats. As in *Oracle*, SAS is claiming "copyright protection only in its *particular* way of naming and organizing" the SAS System. 750 F.3d at 1350. WPL copied those input formats.

WPL's statement in footnote 25 of its Response Brief gives away its game. WPL contends that "any software wanting to 'make use' of the SAS Language would necessarily include significant aspects of the alleged compilation" and suggests that "any expression in a compilation merge[s] with the underlying idea." (WPL Resp. Br. at 20 n.25.) As a matter of logic, that contention amounts to nothing more than that someone intent on knocking off Dickens' *Tale of Two Cities* would necessarily include large chunks of Dickens' prose, but somehow the copied prose would merge with the "idea" of the novel itself. Oracle, in its amicus brief, makes it clear that consideration of filtration of copied items is "evaluated at the time of *creation*, not at the time of *infringement*." (Oracle Amicus Br. at 8-9 (quoting *Oracle*, 750 F.3d at 1361 (emphasis added), ECF No. 447-1.) WPL, just like the defendant in *Oracle*, could have designed WPS differently.

7

*Oracle*, 750 F.3d at 1368. What WPL could not do was "employ the precise phrasing or precise structure chosen by" SAS. *Id*.

In other words, the fact that, for example, the SIDAK option must be included in PROC ANOVA for WPS to accept that option is not evaluated from the point of view of a latter-day infringer but from the point of view of the developers at SAS who decided to include it in the first instance. The illogic of defining the "idea" of software circularly and self-referentially as "performing the function that the software performs" would deny copyright protection to all software by allowing a copier to claim that he was simply implementing the idea of what the existing program does in his later clone. Such an interpretation would undermine Congress's determination to extend copyright protection to computer programs. 17 U.S.C. § 101. It would also contradict the formulation of the A-F-C test as expressed in *Oracle*, which "reject[ed] the notion that anything that performs a function is necessarily uncopyrightable." 750 F.3d at 1357.

## IV. WPL ERRONEOUSLY CLAIMS THAT SAS "DID NOT FILTER"; WPL DISAGREES WITH PROFESSOR STORER'S FILTERING APPROACH, AND DOES NOT ITSELF CONDUCT THE FILTRATION IT INSISTS IS NECESSARY

WPL accuses SAS of an "invalid AFC test" because, while Professor Storer filtered out some levels of abstraction altogether, he did not filter from others where he found, after analyzing them, that the collection, taken as a whole, reflected creative expression. (WPL Resp. Br. at 1-3.) WPL disagrees with Professor Storer's filtering, but that disagreement does not establish that SAS "did not filter." (*Id.* at 15.) In WPL's leading authority, the court dismissed a copyright claim because the plaintiff and its expert had not performed "the abstraction and filtration steps" of the A-F-C analysis at all. *See Macro Niche Software, Inc. v. 4 Imaging Sols., LLC*, No. 12-cv-2293, 2013 WL 12140417, at *5 (S.D. Tex. Dec. 18, 2013). The court observed that the plaintiff had not even alleged "what the levels of generality" of the software were "under the abstraction step" or "which elements" should be filtered out – not even the "idea" of the software, which is not

8

copyrightable "[a]s a matter of law." *Id.* The A-F-C analysis Professor Storer conducted here is not like the wholly absent analysis in *Macro Niche*, where there was "[n]o evidence of how to perform the abstraction or filtration steps" before the court. *Id.*

At bottom, WPL's critique of Professor Storer's filtering analysis is one of conceptual framing, analogous to arguments the copyist made in *Compaq Computer Corp. v. Ergonome, Inc.*, 137 F. Supp. 2d 768, 772 (S.D. Tex. 2001). In that case, while Ergonome claimed copyright protection for a creative arrangement of text and images, Compaq sought to "dismember" Ergonome's expressions into component words and phrases, whereas Ergonome contended that it was the "very arrangement and selection of the words and phrases as a coherent whole that gives rise to copyright protection." *Id.* In other words, while Compaq focused on the "sum of the parts," Ergonome argued that the "more correct inquiry focuses on 'the whole' of the expression." *Id.* The court concluded that the dispute between the parties was over the "framework of analysis" and concluded that Ergnome took the "better view," rejecting Compaq's "[a]tomistic parsing" of the text presented rather than an analysis of "whether the relationship between the words evinces a modicum of creativity by the author." *Id.* at 775.

WPL makes various versions of this same argument throughout its brief, arguing, for example, that Professor Storer "failed to perform filtration under the false assumption that a modicum of creativity negates the need to filter elements that cannot be copyrighted." (WPL Resp. Br. at 3.) But that is not the law. In fact, a creative selection and arrangement – even of *uncopyrightable* elements – *does* give copyright protection. *See Oracle*, 750 F.3d at 1353 (Oracle "not seeking copyright protection for a specific short phrase or word" but "exercised creativity in the selection and arrangement' of the method declarations," which "contain protectable expression that is entitled to copyright protection"); Slip Op. at 11, 14, *Cisco Sys. Inc v. Arista Networks, Inc.*,

9

Case 2:18-cv-00295-JRG Document 454 Filed 09/29/20 Page 13 of 15 PageID #: 25767
REDACTED AND PUBLICLY FILED

No. 14-cv-05344 (N.D. Cal. Dec. 9, 2016) ("selection and arrangement" of command line expressions, modes and prompts, and command responses were protectable as a whole), ECF 441-1. Courts routinely find less creative expression protectable. (*See* Oracle Amicus Br. at 9 (collecting cases protecting Chinese yellow pages, estimates of coin values, pitcher's statistics on a baseball card, and a Chinese menu).)

To the extent WPL claims that aspects of SAS's input formats and output designs should have been *further* filtered, the burden is on WPL to conduct that analysis and to demonstrate that "the elements [it] copied from" the SAS System "are unprotectable." *Compulife*, 959 F.3d at 1305.[5] Rather than perform the analysis WPL claims is necessary, WPL instead tries to poke holes, claiming only that SAS has provided "no evidence of filtration" of elements it claims must be filtered. (WPL Resp. Br. at 27-29 & Appendixes A-F.) Even if WPL had attempted to conduct that analysis itself, the core of protectable expression – the collection of SAS's input formats and output designs – would still survive filtration because any uncopyrightable elements identified by WPL were still selected and arranged as part of SAS's creative and protected expression in the design of the input formats and output designs as a whole.[6]

---

[5] Even if WPL had done the filtration analysis it advocates, identifying various uncopyrightable elements it says are unprotected, the analysis would not result in the filtering out entirely of those elements from the protected collections of SAS's input formats and output designs. Instead, at best, it would be a matter for instructing the jury that there is no protection for, *e.g.*, individual words, so that the jury would not consider those elements in isolation, but only as part of the overall collections of protectable input formats and output designs copied into WPS. *See* Slip Op. at 20, *Cisco Sys.* (identifying "aspects of the asserted elements [that] are not protectable").

[6] SAS is eager to try its claims against WPL. It is not seeking delay in light of *Oracle v. Google* and continues to suffer irreparable injury from the sale of WPL's software. (WPL Resp. Br. at 30.) As explained in its Opening Brief (at 27-29), SAS raised the matter so the Court could make its own determination regarding how best to preserve judicial resources (and avoid a second trial).

REDACTED AND PUBLICLY FILED

| | |
|---|---|
| Dated: September 25, 2020 | Respectfully submitted,<br><br>/s/ Pressly M. Millen<br>Pressly M. Millen<br>*Pro Hac Vice*<br>Raymond M. Bennett<br>*Pro Hac Vice*<br>Samuel B. Hartzell<br>*Pro Hac Vice*<br>WOMBLE BOND DICKINSON (US) LLP<br>555 Fayetteville Street, Suite 1100<br>Raleigh, North Carolina 27601<br>(919) 755-2135<br>press.millen@wbd-us.com<br>ray.bennett@wbd-us.com<br>sam.hartzell@wbd-us.com<br><br>Christian E. Mammen<br>*Pro Hac Vice*<br>Carrie Richey<br>WOMBLE BOND DICKINSON (US) LLP<br>1841 Page Mill Road, Suite 200<br>Palo Alto, California 94304<br>(408) 341-3067<br>chris.mammen@wbd-us.com<br>carrie.richey@wbd-us.com<br><br>Michael C. Smith<br>State Bar No. 18650410<br>SIEBMAN, FORREST, BURG & SMITH, LLP<br>113 East Austin Street<br>Marshall, Texas 75671<br>(903) 938-8900<br>michaelsmith@siebman.com<br><br>***Attorneys for Plaintiff SAS Institute Inc.*** |

REDACTED AND PUBLICLY FILED

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served on counsel for Defendant via the Court's CM/ECF system and by email on September 25, 2020.

 /s/ Pressly M. Millen  
Pressly M. Millen