IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SAS INSTITUTE INC., | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 2:18-CV-00295-JRG |
| WORLD PROGRAMMING LIMITED, | § § § § | |
| *Defendant*. | § § | |

## MEMORANDUM OPINION AND ORDER

The Court conducted a Copyrightability Hearing on October 14, 2020. Having considered the arguments of the parties, the related briefing, the evidence presented, and the relevant authorities, the Court finds that the works asserted in the above-captioned case have not been shown to be copyrightable, and therefore plaintiff's copyright claims should be and hereby are **DISMISSED WITH PREJUDICE**.

Also before the Court is World Programming Limited's ("WPL") Motion to Renew Dkt. Nos. 275 & 308 (the "Motion to Renew") (Dkt. No. 457), which the Court hereby **GRANTS**. Furthermore, the Court **GRANTS** Defendants'[1] Corrected Motion to Exclude the Testimony of Dr. James Storer on Issues Related to Copyright Infringement (the "Motion to Exclude"). (Dkt. No. 275.) The Court **DENIES AS MOOT** Defendants' Motion to Strike Portions of the Declaration of Keith Collins (Dkt. No. 308).[2]

---

[1] Since the filing of the Motion to Exclude, several Defendants have been dismissed. The Court treats the Motion to Exclude as Defendant World Programming Limited's Motion.

[2] The parties represented to the Court that they were in agreement that Mr. Keith Collins's testimony would be admissible to the extent that he was disclosed by SAS. Accordingly, the Court considers the declaration and testimony of Mr. Collins to the extent he was disclosed by SAS, which includes "history and operations of SAS, including company research and development of

## I. BACKGROUND

On the eve of a jury trial in the above-captioned case, the Court found before it two opposing motions for summary judgment on copyrightability. It became apparent to the Court that the copyright claims asserted by Plaintiff SAS Institute Inc. ("SAS") were not capable of going to trial until a determination of the protectable parts of the works was achieved. Finding that resolving copyrightability within the limited framework of Federal Rule of Civil Procedure 56 would not be faithful to precedent, the Court issued an Order as to Copyrightability (Dkt. No. 436) and set a Copyrightability Hearing to allow the parties to present evidence in support of the abstraction and filtration steps of the abstraction-filtration-comparison test, as addressed in *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706 (2d Cir. 1992) and later adopted by the Fifth Circuit in *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1341 (5th Cir. 1994). By means of this Copyrightability Hearing, the Court sought to determine and identify what core protectable expression, if any, was covered by each asserted work.

## II. LEGAL STANDARDS

Copyright subsists in "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). A work is original to the author when it was independently created and reflects a modicum of creativity. *Feist Publ'ns v. Rural Tel. Serv.*, 499 U.S. 340, 344–45 (1991). "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* Originality does not require novelty. *Id.* Further, copyrightable works may contain both protectible and unprotectible elements. *Id.*

---

the SAS System, SAS System input formats and output designs, and registration of copyrights." (Dkt. No. 408-1 at 2.)

To establish copyright infringement, a copyright owner must show "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Id.* at 362. "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *see also* 17 U.S.C. § 14(a). To show actionable copying (i.e., copying of original elements of the work), a plaintiff must show two things: (1) the defendant actually used the copyrighted material to create his work, and (2) probative similarity, which "requires a showing that the works, 'when compared as a whole, are adequately similar to establish appropriation.'" *Id.* (quoting *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 397 (5th Cir. 2001)).

It is settled law that, to at least some extent, software is entitled to copyright protection. Copyright protection as to software can extend not only to "literal" elements (i.e., source code, assembly code, object code), but also to "non-literal" elements (structure, sequence, organization, operational modules, user interface, etc.). *Eng'g Dynamics,* 26 F.3d at 1341. SAS here alleges that WPL has copied non-literal elements, namely the SAS System's input formats, output designs, and naming and syntax. (Dkt. No. 441 at 3; *see* Transcript of 10/14/2020 Copyrightability Hearing.)

In assessing infringement of non-literal elements, the Fifth Circuit has adopted the "adaption-filtration-comparison" (AFC) test posited by the Tenth and Second Circuits and Nimmer on Copyright, and widely adopted by other courts. *Id.*; *see also Altai*, 982 F.2d 693; *Gates Rubber Co. v. Bando Chem. Indus.*, 9 F.3d 823 (10th Cir. 1993). The AFC test entails three steps: (1) dissecting the program into its constituent levels of generality ("abstraction"); (2) filtration of unprotectible elements, such as ideas, facts, processes, public domain material, merger material, and *scènces à faire*; and (3) comparison of the remaining "golden nugget" or "core" of protectible

3

elements to the work accused of infringement to determine whether the defendant has copied the plaintiff's protected expression.

Copyrightability is a question of law for the Court, but copyright infringement is a question for the trier of fact. 3 NIMMER ON COPYRIGHT § 12.10[A], [B][1]. Accordingly, the AFC test seeks to "filter[] out" nonprotectable elements such that such that "there remains a 'core protectable expression.'" *Gen. Univ. Sys.*, 379 F.3d at 142 (quoting *Gates Rubber*, 9 F.3d at 841). If a core of protectable expression is found, "[t]ypically, the question whether two works are substantially similar,"—i.e., the infringement analysis—"should be left to the ultimate factfinder." *Id.*

Accordingly, in its Order setting a Copyrightability Hearing, the Court ordered the parties to:

> present evidence in support of the abstraction and filtration steps of the abstraction-filtration-comparison ("AFC") test, as addressed in *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706 (2d Cir. 1992) and later adopted by the Fifth Circuit in *Engineering Dynamics*. 26 F.3d at 1341. It is intended that this hearing will facilitate a determination by the Court as to what is the core protectable expression, if any, covered by each asserted work. Should the Court identify any such core protectable expression, then such determination will subsequently facilitate an accurate "comparison" as part of the infringement analysis by the jury.

(Dkt. No. 436 at 2.)

### III. FINDINGS OF FACT

SAS Institute Inc. offers customers "an integrated range of software products known as the 'SAS System'" which "enables users to perform a variety of tasks related to data access, data management, data analysis (including statistical analysis), and data presentation." (Dkt. No. 128 at 5 (¶ 21).) The SAS System allows a user to use its functionalities by entering a user-created program into the SAS System graphical user interface. (*Id.* at 6 (¶ 27).) Users write commands in the SAS Language—a high-level programming language developed and maintained by SAS—

that instruct on what data analysis algorithms to run.  (*Id.* at 7 (¶ 30); Dkt. No. 264-1 ¶ 6; *see also* Testimony of Keith Collins at 10/14/2020 Copyrightability Hearing (stating that the SAS Software is a "programming language").)

An earlier version of the SAS Software called "SAS 76"[3] is in the public domain.  *S & H Computer Sys., Inc. v. SAS Insti., Inc.*, 568 F. Supp. 416, 419 (M.D. Tenn. 1983); *see also* Dkt. No. 272-3 at 63:13–15 (acknowledging SAS 76 is public domain).  Many of the PROCs (or procedures) used in SAS 76 are identically named to those in current versions of the SAS Software.  (Dkt. No. 451-25 ¶¶ 115–116.)  Many of the output designs are also identical or nearly-identical. (*Id.* at 53–56.)

Part of the SAS System are "PROCs" that the user may use to perform various analyses on data.  (Dkt. No. 264-1 ¶ 9.)  Every SAS PROC is separately written and has its own design including its own syntax, options, statements, and defaults.  (*Id.*)  Each PROC corresponds to a separately identified piece of prewritten, specialized software that runs so as to give the user the desired data analysis.  (*Id.*)  Ultimately, the PROCs are what the user uses to write its program, and the PROCs make the functionality of the software available to the user.  (Dkt. No. 441-2 ¶ 3.) PROCs enable data analysis functionality through mathematical and statistical algorithms, calculations, variables, and measurements, such as FACTOR (to give a common factor), DISTANCE (to calculate a distance between data points), and STDIZE (to standardize numeric variables).  (Dkt. No. 441-3 at 16–17.)

When the user runs programs in the SAS Language, he or she is able to view the results of the data analysis through tables, graphs, and other forms of output on the screen.  (*Id.* ¶ 11.)  Much

---

[3] The name is due to the fact that SAS Institute was formed in 1976.  (Dkt. No. 441-3 at 6.)  "SAS 76" is an early version of the software.

of the output is viewed through the SAS Output Delivery System, or ODS. (*Id.*) The output can be viewed by the user graphically, such as through the use of tables, graphs, charts, plots, colors, texts, and fonts. (Dkt. No. 441 at 13; Dkt. No. 441-2 at Fig. 2; Dkt. No. 264-1 ¶ 11.)

SAS holds myriad copyrights in various aspects of the SAS System. (Dkt. No. 264-1 ¶¶ 19–22; Dkt. Nos. 261-4, 264-5, 264-6.) In the present case, SAS asserted rights in the SAS System software (the "Asserted Works" or "SAS System"). (Dkt. No. 441 at 3, 5; *see* Transcript of 10/14/2020 Copyrightability Hearing at 13–18.) The asserted SAS System includes input formats, output designs, and keywords. (Dkt. No. 441 at 3.) Input formats include "the collection of PROCs, statement, options, formats, informats, global statements, access engines and other elements available to the user and the syntax, all of which govern what the user's input must look like." (Dkt. No. 441-3 at 26.) Output designs include "the collection of content and formatting, including default parameters, used to display information in response to the user's input." (*Id.* at 27.) Keywords include "[n]aming and syntax of individual PROCs, statements, options, default parameters, and other elements." (*Id.*)

WPL creates a product that competes with the SAS Software known as the World Programming System (WPS). (Dkt. No. 264-11 at 30–31.) WPL created its integrated system of software products to run applications that users have written in the SAS Language. (*Id.*) WPL's business was to "clone" the SAS Software. (Dkt. No. 264-8 at 3 (internal WPL documentation explaining that "[o]ur base position is always to do what SAS does"); Dkt. No. 264-9 at 1 (internal WPL e-mail commenting that the "focus" of WPS is to be "a follow my leader SAS cloner"); Dkt. No. 264-10 (internet forum posting by WPL employee explaining that "[w]hat we're doing is equivalent to SAS data libraries. Identical in fact as we write a SAS clone.").) Accordingly, WPS

emulates the SAS System by "[p]ars[ing] SAS Language input files" to "[p]roduce equivalent data output" and "[p]roduce[] similar graphical output." (Dkt. No. 264-11 at 30–31.)

SAS presented a single technical expert, Professor James Storer, upon whom it relied for his copyrightability opinions. Despite much obfuscation,[4] Professor Storer ultimately did not filter out any unprotectable material from the asserted works. (Dkt. No. 451-9 at 156:22–157:25, 158:16–160:14, 160:19–164:18; Dkt. No. 441-2 ¶ 18 (Declaration of James Storer containing a single cursory paragraph on "The Filtration Step"); *see also* Transcript of 10/14/2020 Copyrightability Hearing Transcript at 170–178 (including testimony by Professor Storer that he did not filter out SAS 76).) Instead, Professor Storer purportedly "filtered out" the two highest levels of his proposed abstraction; i.e., the main purpose of the program and the interface mechanisms. (Dkt. No. 441-3 at 30–40.) However, he maintained that all collections of input formats; collections of output designs; and the naming and syntax of individual functions, commands, operators, keywords, special characters and data types were wholly protectable. (*Id.*)

### IV.  CONCLUSIONS OF LAW

#### A.  Abstraction

"The purpose of segmenting a computer program into successive levels of generality is to 'help a court separate ideas [and processes] from expression and eliminate from the substantial similarity analysis those portions of the work that are not eligible for copyright protection.'" *Eng'g Dynamics*, 26 F.3d at 1342 (quoting 3 Nimmer, § 13.03[F] at 13–102.17).

SAS's technical expert, Professor Storer, conducted the abstraction step by breaking the SAS System into five levels of abstraction:

1. Main purpose of the program;

---

[4] As discussed *infra* at Section IV.E.

2. Interface mechanism;

3. Input formats (including the collection of PROCs, statements, options, formats, input formats, global statements, access engines and other elements available to the user and the syntax, all of which dictate what the user's input must look like);

4. Output designs (the collection of content and formatting, including default parameters, used to display information in response to the user's input); and

5. Naming and syntax of individual PROCs, statements, options, default parameters, and other elements.

(Dkt. No. 441 at 11; Dkt. No. 441-2 ¶ 11.)

WPL's expert Dr. Jones conducted the abstraction step by breaking the asserted SAS System into six layers:

1. The Main Purpose of the Program – the main purpose or ultimate function of the program is to provide ways of performing statistical analysis and view the results, including by letting users execute programs written in the SAS Language;

2. The Program Architecture – the program architecture is the overall set of components and relationships between them that work together to operate in a certain way;

3. Modules – the data modules contain algorithms and data structures and represent functions or operations that can be carried out to accomplish a given task, such as an operation to read and store input data;

4. Algorithms and Data Structures – the algorithms are the processes or sets of rules that are followed in an operation to solve a problem, such as a particular formula or set of steps to calculate a regression. The data structures are the stores of values and attributes about them or relationships between them, such as an object with information about a dataset;

5. Source Code – the source code is the set of human-readable code or instructions written by programmers or developers that, when compiled into object code, comprise the object code that is run and launches the SAS software; and

6. Object Code – the object code is the machine-readable code or instructions (as would be in an executable) that when run launches the SAS software and allows the user to interact with it.

(Dkt. No. 451 at 26–27.)

The six layers of abstraction laid out by WPL are taken from the framework laid out in *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823 (10th Cir. 1993). The *Gates Rubber* framework was adopted by the Fifth Circuit in *Engineering Dynamics*. 26 F.3d at 1342–

3, n.10. Accordingly, the Court proceeds with the layers of abstraction set out by WPL, as rooted in the AFC case law.[5]

### B.     Filtration

Various authorities hold that copyrightability is, at least in part, a question of law, reserved for determination by the Court. *See, e.g., Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1353 n.3 (Fed. Cir. 2014) (collecting cases). On the other hand, copyright infringement itself is a question properly placed before the fact finder—in this case, the jury. Where rights in non-literal elements of computer software are at issue, the analysis mandated by the Fifth Circuit—the AFC analysis— includes aspects of both questions.  In order for the jury to make a clear and reliable determination of whether infringement exists as to the asserted non-literal elements of the computer software at issue (and consistent with Fifth Circuit precedent holding that copyrightability is at least in part a question of law) the Court now undertakes the filtration of nonprotectable elements to discern what, if any, "core protectable expression" remains. *Gen. Univ. Sys.*, 379 F.3d at 142 (quoting *Gates*, 9 F.3d at 841). Accordingly, the Court "filters out" ideas, facts, information in the public domain, merger material, and *scènces à faire*. *Eng'g Dynamics*, 26 F.3d at 1344.

The present copyrightability dispute between the parties largely centers around a difference in the scope of filtration. "Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scènces à faire* material, and other unprotectable elements suggested by the particular facts of the program under examination." *Id.* at 1343 (quoting *Gates Rubber*, 9 F. 3d at 834). The filtration analysis therefore

---

[5] Generally, the parties' differences as to the abstraction element of the AFC analysis are minor. The Court therefore adopts the proposal rooted in the progeny of cases adopted by the Fifth Circuit. Were the Court to adopt a different schema of abstraction, the outcome of the filtration element *infra* would not change.

may result in filtering out as unprotectable *all* elements of an asserted work, or filtering out *no* elements of an asserted work, or somewhere in-between (i.e., finding that some but not all elements of an asserted work are entitled to protection). However, without performing any filtration at all, the subsequent comparison element of the test is flawed by definition because it is potentially burdened with unprotectable material. The goal of the filtration analysis is to lead to an accurate and fair comparison, which facilitates the ultimate infringement determination by the finder of fact.

### C. Burden of Proof Framework

The Fifth Circuit has not presently provided clear authority on the burden of proof in the filtration analysis of copyrightability. However, the Eleventh Circuit recently addressed this issue in *Compulife Software Inc. v. Newman*. 959 F.3d 1288 (11th Cir. 2020). In *Compulife*, the Eleventh Circuit held that a burden-shifting framework was appropriate, in which plaintiff first proves a valid copyright and factual copying. *Id.* at 1306. The burden then shifts to defendant to "prove that some or all of the copied material is unprotectable." *Id.* If the defendant so shows, the burden shifts back to the plaintiff to respond.[6]

In grappling with "the burden of proof applicable to the filtration step[7] of the substantial-similarity analysis," the Eleventh Circuit noted that although unprotected material has been disregarded in the copyright analysis for at least a century, "[c]onceiving of filtration as a distinction step in the infringement analysis [ ] came into the law relatively recently." *Id.* at 1303. "Filtration can be tricky because copied material may be unprotectable for a wide variety of

---

[6] In *Compulife*, the Court found that "the burden shifts back to the plaintiff to prove substantial similarity between any remaining (*i.e.*, unfiltered) protectable material and the allegedly infringing work." 959 F.3d at 1306.
[7] Like the Fifth Circuit, the Eleventh Circuit has adopted a version of the Abstraction-Filtration-Comparison test from *Altai*. *Compulife*, 959 F.3d at 1303.

reasons." *Id.* at 1304.  Relying on the foremost treatise on Copyright Law, *Nimmer on Copyright*, the Eleventh Circuit noted that the plaintiff in a copyright action is to "respond to any proof advanced by the defendant that the portion of copyrighted work actually taken does not satisfy the constitutional requirement of originality." *Id.* at 1305 (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 (11th Cir. 1996) (citing Nimmer on Copyright § 13.03[F][3])).  The Eleventh Circuit also noted that placing the whole of the burden on the plaintiff would "unfairly require him to prove a negative," by demonstrating that the whole universe of unprotectability did not exist. *Id.* at 1305 ("If the plaintiff had the burden of proving protectability, he would have to preemptively present evidence negating all possible theories of unprotectability just to survive a motion for summary judgment." *Id.* (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).  "Placing the burden on the defendant, by contrast, merely requires him to identify the species of unprotectability that he is alleging and to present supporting evidence where appropriate." *Id.* at 1306.  "The plaintiff then faces the manageable task of responding to the appropriately narrowed issue." *Id.* (internal quotations and citations omitted).

This burden-shifting framework is a sensible way to determine copyrightability, and the Court adopts this framework.  WPL correctly points to *Engineering Dynamics* for the proposition that "to establish copyright infringement, a plaintiff must prove ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." (Dkt. No. 451 (citing *Eng'g Dynamics*, 26 F.3d at 1340) (emphasis and internal quotations omitted).)  The initial copyrightability burden rests on the party asserting copyright infringement.  Indeed, the Court recognized as much implicitly by requiring SAS to file the opening brief on copyrightability. (Dkt. No. 436 at 3.)  However, that initial burden is not heavy.  A registered copyrighted work should

be entitled to a presumption of protectability.[8] A copyrighted work comprises numerous elements, many of which may be protectable, and many of which may be unprotectable. Thus, once a plaintiff has established some extent of protectability, the burden shifts to the defendant to show there are elements within the work which are not entitled to protection.

It only makes sense that the burden should shift to the defendant once the plaintiff establishes a threshold of protectability. "Protectability can't practicably be demonstrated affirmatively but, rather, consists of the absence of the various species of *un*protectability." *Compulife*, 959 F.3d at 1305 (emphasis in original). Once the plaintiff establishes that he has something protectable, the defendant may come forward with evidence that what it has copied—as preliminarily established by plaintiff—is not protectable. The defendant's burden "merely requires him to identify the species of unprotectability that he is alleging and to present supporting evidence where appropriate." *Id.* Should the defendant establish that at least some of the copyrighted work is not protectable expression, the burden shifts back to the copyright holder to undertake the "manageable task" of establishing which parts of its asserted work are, in fact, properly entitled to protection. *Id.* at 1306.

D.     **Burden Shifting As Done By The Parties**

Here, Plaintiff SAS showed that it holds a registered copyright, amply argued that its asserted works are creative,[9] and presented repeated evidence of factual copying. Accordingly,

---

[8] This presumption of protectability is in addition to the presumption of validity afforded to registered copyrights. *Gen. Universal Sys.,* 379 F.3d at 141.

[9] SAS attempts to analogize the copyrightability of its input formats to the Supreme Court's current consideration of copyright protection of software in *Google LLC v. Oracle America, Inc.*, No. 18-956. In so doing, SAS collapses its shifting burden to show protectability into a mere showing of a modicum of creativity. As discussed *infra*, a showing of protectability is more extensive than merely showing that an asserted work contains some "minimal degree of creativity" in any part of the work, however small. *Feist*, 499 U.S. at 345. In any event, the Court does not find the issues squarely before the Supreme Court in *Google LLC v. Oracle America, Inc.* to be controlling here.

SAS shifted the burden to WPL. Defendant WPL then came forward with evidence showing that material within the copyrighted work was unprotectable. However, SAS thereafter failed to show any remaining protectability, either by affirmatively showing some elements of the work to be protectable or by combatting Defendant's showing of unprotectability.

After SAS shifted the initial burden, Defendant WPL was required to show what it copied was unprotectable. WPL established that at least some of the asserted works were unprotectable because they were in the public domain, including anything ported into the present-day SAS System from SAS 76. (Dkt. No. 451-25 ¶¶ 65–66, 108–214; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201.) WPL presented evidence that the SAS Language should be filtered out, as it is open and free for public use. (Dkt. No. 451-25 at ¶¶ 124–126; *SAS Insti.*, 64 F. Supp. 3d at 762; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201.) WPL additionally presented evidence that the SAS System contained unprotectable open source elements (Dkt. No. 451-23 ¶¶ 139–145); factual and data elements (*Id.* ¶¶ 146–150; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201); elements not original to SAS (Dkt. No. 451-25 ¶¶ 151–172); mathematical and statistical elements (*Id.* ¶¶ 173–179); process, system, and method elements (*Id.* ¶¶ 180–184); well-known and conventional display elements, such as tables, graphs, plots, fonts, colors, and lines (*Id.* ¶¶ 185–191; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201); material for which SAS Institute Inc. is not the author (Dkt. No. 451-25 ¶¶ 192–195); merged elements (*Id.* ¶¶ 196–204; *see* Transcript of 10/14/2020 Copyrightability Hearing at 191–201); statistical analysis *scènces à faire* elements (Dkt. No. 451-25 ¶¶ 205–210); and short phrase elements (*Id.* ¶¶ 211–214).

WPL therefore produced ample evidence that unprotectable elements exist within and as a part of the SAS System, identifying many "species of unprotectability" contained in the asserted

works. *Compulife*, 959 F.3d at 1306. Once a defendant establishes that at least some of the material is not entitled to protection, the burden shifts back to the plaintiff to "face[] the manageable task of responding to the appropriately narrowed issue" and combat the allegations. *Id.* This may occur either by showing what defendant alleges as not protectable actually is entitled to protection, or by coming back and showing that there are remaining and identifiable protectable elements that defendant copied.[10]

SAS has done neither. SAS has not attempted to show what WPL pointed to as unprotectable is indeed entitled to protection. (Dkt. No. 441-2 at 7 n.1, 12; *see* Transcript of 10/14/2020 Copyrightability Hearing at 170–178.) Similarly, SAS has not shown the existence and extent of any remaining protectable work. Instead, when the burden shifted back to SAS, it was clear SAS had done no filtration; they simply repeated and repeated that the SAS System was "creative." (Dkt. No. 451-9 at 156:22–157:25, 158:16–160:14, 160:19–164:18; *see also* Transcript of 10/14/2020 Copyrightability Hearing at 170–178.) SAS's failures have raised the untenable specter of the Court taking copyright claims to trial without any filtered showing of protectable material within the asserted work. This is not a result that this Court can condone. These failures rest solely on SAS and the consequences of those failures necessarily rest upon SAS as well.

### E. Exclusion of Dr. James Storer

Separately and in light of the particularly meager AFC analysis performed by Dr. Storer–which can, at best, be described as scant—the Court finds that his analysis and methodology are

---

[10] The *Compulife* Court focused only on this second ability for a plaintiff to reemerge—i.e., that "the burden shifts back to the plaintiff to prove substantial similarity between any remaining (*i.e.,* unfiltered) protectable material and the allegedly infringing work." 959 F.3d at 1306. The *Compulife* Court was therefore able to progress farther than this Court in the present case. Since SAS failed to meet its burden of persuasion to combat WPL's allegations of unprotectability, this Court never reaches substantial similarity.

14

unreliable. Specifically, at a minimum, Dr. Storer's failure to filter out unprotectable elements resulted in an improper comparison of unprotectable elements to the accused products, rendering his opinions unreliable and unhelpful to the jury. Fed. R. Evid. 702(a); *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993); *see also Gen. Universal Sys.*, 379 F.3d at 142 (explaining that a plaintiff demonstrates actionable copying "by showing that the allegedly infringing work is substantially similar to **protectable** elements of the infringed work") (emphasis added). This determination is reinforced and supported by the egregious conduct of Dr. Storer, as documented in Defendants' Corrected Motion to Exclude Testimony of Dr. James Storer on Issues Related to Copyright Infringement (Dkt. No. 275); Defendants' Motion to Strike SAS Institute Inc.'s Expert Dr. Storer for Violating Rule 26(a)(2)(B), Rule 37(a)(4), and Rule 37(b); and the Discovery Hotline Order (Dkt. No. 256). Accordingly, the Court **GRANTS** the Motion to Exclude.[11]

## V. CONCLUSION

In light of the foregoing, and having considered the evidence, the arguments of the parties, the related briefing, and the relevant authority, the Court is of the opinion that the copyright claims of SAS in the above-captioned case have not been shown to be copyrightable, and therefore should be and hereby are **DISMISSED WITH PREJUDICE**. However, the preclusive effect of such dismissal is tailored to this case and the asserted works. This dismissal precludes SAS Institute Inc. from asserting against World Programming Limited the non-literal elements of the SAS System Software.

The Parties are **ORDERED** to meet and confer and to file a Joint Status Report setting forth their views on the current status of this case in light of this ruling and identifying any

---

[11] As Dr. Storer was the only technical expert offered by SAS, his exclusion has the practical effect of leaving SAS without any supportable copyright claims. This is true regardless of the copyrightability determination made *supra*.

15

remaining claims ripe for the currently-set January 4, 2021 trial. Such Joint Status Report shall be filed on or before **ten (10) days** from the date of this Order. In such Joint Status Report, the Parties are also to identify which, if any, previously asserted pretrial motions need to be renewed or supplemented and why.

**So ORDERED and SIGNED this 26th day of October, 2020.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE